In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3551

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARTY C. STACY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 12 CR 40094-001 — **J. Phil Gilbert**, *Judge*.

ARGUED SEPTEMBER 10, 2014 — DECIDED OCTOBER 20, 2014

Before WOOD, *Chief Judge*, and EASTERBROOK and TINDER,
*Circuit Judges*.

TINDER, *Circuit Judge*. Marty Stacy was convicted after a
jury trial of conspiracy to manufacture methamphetamine,
21 U.S.C. §§ 841(a)(1), 846, and possession of pseudoephed-
rine knowing that it would be used to manufacture meth-
amphetamine, 21 U.S.C. § 841(c)(2). The district court sen-
tenced him to a prison term of 336 months. On appeal, Stacy
argues that the district court misapplied Federal Rule of Ev-

idence 404(b) by admitting evidence of his prior possession of methamphetamine and unreasonably imposed a prison sentence that did not account for an alleged disparity in treatment of pseudoephedrine and methamphetamine offenses. We affirm Stacy's conviction and sentence. We conclude that the district court erred in admitting the evidence of his prior acts under the approach to Rule 404(b) adopted in *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (en banc), but that the error was harmless.

## I.    BACKGROUND

In May 2012, Michael Bertin, a sheriff's deputy in Richland County, Illinois, initiated a traffic stop of a truck driven by 17-year-old Kaleb Bracken in which Stacy was a passenger. Bertin knew at the time that Stacy and Bracken had recently purchased notable quantities of pseudoephedrine pills from local pharmacies, possibly for use in manufacturing methamphetamine. When an officer then found a glass smoking pipe in the truck, Stacy and Bracken were arrested for possession of methamphetamine. Eventually, Stacy was charged with one count of conspiracy to manufacture methamphetamine and four counts of possession of pseudoephedrine knowing that it would be used to manufacture methamphetamine.

### A. NOTICE OF INTENT TO USE PRIOR-ACT EVIDENCE

As Stacy headed to trial, the government provided notice that it planned to introduce evidence under Rule 404(b) about his arrest in March 2008 for possession of methamphetamine. Stacy objected, arguing that this evidence was highly prejudicial and had low probative value because it

involved different co-conspirators and possession rather than manufacture of methamphetamine. At a hearing on the matter, the government noted that Stacy had been found in 2008 with a bag of methamphetamine in his pocket and argued that this evidence went "to the heart of the intent" for the charged crimes. Without analyzing the government's argument, the district court stated that it would allow the evidence as long as the government laid a proper foundation at trial. The court promised to caution the jury about the limited use of the evidence under Rule 404(b).

## B. TRIAL EVIDENCE

Stacy's trial lasted two days. Despite getting initial permission to present evidence about the 2008 incident, the government did not introduce that evidence until midway through the second day. Before that, the government presented testimony about Stacy's efforts in 2010 through 2012 to obtain pseudoephedrine pills for use in making methamphetamine.

The government's first witnesses explained that pseudoephedrine pills are necessary to make methamphetamine and legally obtainable from local pharmacies. Pharmacies must log pseudoephedrine sales in a national database and check purchases against that database to make sure that no single person exceeds daily or monthly purchasing limits. People who cook methamphetamine sometimes seek to circumvent those limits, a police consultant said, by sending other people to purchase pills—a process called "smurfing." The government introduced logs from the national database showing the pseudoephedrine purchases of Stacy and his alleged coconspirators.

The government next presented eyewitness testimony about Stacy's use of "smurfs" to purchase pseudoephedrine pills for making methamphetamine. Four witnesses, including Kaleb Bracken and Jennie Edgington, who was living with Stacy when he was arrested, testified that they had purchased pseudoephedrine pills and given them to Stacy for use in manufacturing methamphetamine on multiple occasions. Bracken also testified that the pipe found at Stacy's arrest is for smoking methamphetamine and that it was not in his truck before he picked up Stacy. Edgington told the jury that police recovered a scale used to weigh methamphetamine from Stacy's room after his arrest. A fifth witness testified that Stacy had provided her and her boyfriend, Chris Stout, with pills and other supplies for making methamphetamine.

The government then presented Sheriff Andy Hires, warning the district court that his testimony would constitute evidence of a prior act. The government asserted that it was introducing the testimony to prove "intent and knowledge"—that Stacy knew pseudoephedrine "was a controlled substance and that it was for the purpose of making methamphetamine." The district court did not conduct any further analysis, but gave an instruction cautioning the jury to consider Hires's testimony only on the issues of intent and knowledge, not Stacy's propensity to commit the charged offenses.

Hires testified that in March 2008 he responded to a call about a vehicle parked at an abandoned house and encountered Stacy and two other men inside the house. He said that a dog brought to the house alerted to the presence of drugs, leading to a search of Stacy and the vehicle. Hires explained

that Stacy had "a small corner-cut baggy that had a white powdery substance" in his pocket and identified the bag as an exhibit introduced by the government. Hires added that his team also found two packages of pseudoephedrine pills in the trunk of the vehicle along with methamphetamine residue and additional items used to manufacture methamphetamine. On cross-examination, defense counsel elicited that Stacy was charged with possession of methamphetamine at that time, but that case "was disposed of." A second officer confirmed that he helped preserve the bag found in Stacy's pocket.

The government continued by presenting additional evidence about Stacy's involvement with methamphetamine. The government showed the jury the scale recovered from Stacy's room, and a forensic scientist testified that there was methamphetamine residue on it. Two methamphetamine cooks, Chris Stout and Jason Banker, testified that Stacy had provided them with pseudoephedrine for making methamphetamine. Banker added that he had seen Stacy using a scale to weigh methamphetamine. An additional witness, a smurf, testified about giving pills to Stacy for use in making methamphetamine and about using the drug with him.

Finally, the government presented sheriff's deputy Michael Bertin, who was involved in investigating Stacy's activities in both 2008 and 2012. Bertin confirmed the chain of custody for the bag of methamphetamine found on Stacy in March 2008. He also testified about recovering the glass smoking pipe from the vehicle at Stacy's arrest in 2012, and he spoke about the search of Stacy's residence, where police found an electronic scale for weighing methamphetamine on a dresser in his room and a pill container with one

pseudoephedrine pill and one painkiller. Lastly, Bertin discussed a summary of pharmacy logs showing that, on multiple occasions, Stacy and his affiliates had made purchases of pseudoephedrine pills within short time frames of each other.

The government then rested its case. Stacy discussed with the district judge the possibility of testifying himself—acknowledging that he "took a blood bath yesterday"—but ultimately did not present any evidence in defense. The court again warned the jury not to consider the evidence of Stacy's earlier crime for any purpose other than determining intent, knowledge, or lack of mistake. The jury returned a verdict of guilty on all five counts and a special verdict finding that the conspiracy involved manufacturing more than 50 grams of methamphetamine.

### C. SENTENCING

In advance of sentencing, a probation officer, using pharmacy logs, determined that Stacy was responsible for relevant conduct involving 326.98 grams of pseudoephedrine. The probation officer also recommended an offense-level increase of two for Stacy using a person under eighteen, Kaleb Bracken, to commit the offense. U.S.S.G. § 3B1.4. The total recommended offense level was 36 with a criminal history category of VI, for an advisory sentencing range of 324 to 405 months for the conspiracy count and 240 months—the statutory maximum—for the pseudoephedrine counts.

The district court accepted the probation officer's recommendations and imposed a within-range prison sentence of 336 months. In asking for leniency, Stacy's attorney em-

phasized that Stacy was 47 years old and would reach age 70 in prison even if given a sentence at the low end of the sentencing range. The court decided, however, that none of the factors under 18 U.S.C. § 3553(a) weighed in Stacy's favor, explaining that Stacy is "no dummy" and knew better than to manufacture methamphetamine, and that he had "one of the worst criminal histories" the court had ever seen.

## II. DISCUSSION

### A. EVIDENCE OF OTHER ACTS

Rule 404(b)(1) prohibits the admission of evidence of crimes, wrongs, or other acts for the purpose of proving a person's character or propensity to behave in a certain way. Rule 404(b)(2), however, allows admission of other-act evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Before our decision in *Gomez*, we determined admissibility under Rule 404(b) using a four-part test that analyzed "whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *United States v. Zapata*, 871 F.2d 616, 620 (7th Cir. 1989). In *Gomez*, however, this court, sitting en banc, abandoned that approach, noting that, "[e]specially in drug cases like this one, other-act evidence is too often admitted almost auto-

matically, without consideration of the 'legitimacy of the purpose for which the evidence is to be used and the need for it.'" 763 F.3d at 853 (quoting *United States v. Miller*, 673 F.3d 688, 692 (7th Cir. 2012)). We thus adopted "a more straightforward rules-based approach," which is summarized as follows:

> [T]o overcome an opponent's objection to the introduction of other-act evidence, the proponent of the evidence must first establish that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way. *See* Fed. R. Evid. 401, 402, 404(b). Other-act evidence need not be excluded whenever a propensity inference can be drawn. But its relevance to "another purpose" must be established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case. If the proponent can make this initial showing, the district court must in every case assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice and may exclude the evidence under Rule 403 if the risk is too great. The court's Rule 403 balancing should take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case.

*Id*. at 853, 860.

Applying this new test, we determined that the district court erred by admitting evidence of cocaine found in Gomez's bedroom in his trial for conspiracy to distribute cocaine. *Id.* at 862–63. The government had introduced phone calls discussing cocaine deals from Gomez's alleged coconspirator to *someone* in Gomez's residence, and Gomez argued mistaken identity. The district court then allowed the government to introduce the cocaine found in Gomez's bedroom for the purpose of proving identity. We explained, however, that the government's identity argument relied on a forbidden propensity inference—that Gomez was more likely the culprit because he had possessed drugs before—and that the government had failed to explain "how the evidence is relevant in a *propensity-free* way." *Id.* at 863 (emphasis in original).

The same flaw underlies the government's argument here. The government maintains that the events surrounding Stacy's prior possession of methamphetamine—particularly the presence of pseudoephedrine pills—were probative of his intent to use pseudoephedrine to make methamphetamine and his knowledge of the process for making methamphetamine. But as in *Gomez*, this argument relies on a propensity inference: that Stacy's history of involvement with methamphetamine manufacturing makes it more likely that he intended to use the pseudoephedrine pills he collected in 2010 through 2012 to make methamphetamine. For that reason, we are persuaded that the court erred by admitting the evidence of Stacy's prior involvement with methamphetamine. *See United States v. Chapman*, 765 F.3d 720, 726–27 (7th Cir. 2014) (concluding that admission of prior drug conviction to prove intent to distribute was error); *United States v. Lee*, 724 F.3d 968, 980 (7th Cir. 2013) (same); *Miller*, 673 F.3d

at 699-700 (same); *see also Gomez*, 763 F.3d at 862–63 (rejecting government's argument as relying on the theory of "[o]nce a drug dealer, always a drug dealer").

Even if the government could somehow muster a permissible purpose for this evidence, it would not remedy the district court's decision to admit it without assessing whether the government had established a specific, permissible purpose for the evidence under Rule 404(b) or whether the probative value of the evidence was substantially outweighed by the risk of unfair prejudice under Rule 403. The court accepted the government's asserted purpose for the evidence without explanation, offering only a limiting instruction as a safeguard against the evidence's misuse. More analysis is warranted "where, as here, reasonable minds could disagree as to which exception to Rule 404(b) applies, whether an exception applies at all, and whether the strength of the evidence outweighs its potential for undue prejudice." *United States v. Moore*, 641 F.3d 812, 823 (7th Cir. 2011). Without an articulation of the district court's rationale, it is difficult for us to determine that the court properly observed the limits of Rule 404(b). *See Lee*, 724 F.3d at 977–78; *Moore*, 641 F.3d at 822–23; *United States v. Beasley*, 809 F.2d 1273, 1279–80 (7th Cir. 1987).

The jury instructions about the limits of Rule 404(b) did not cure the district court's error. The boilerplate instructions given in this case allowed the jury to consider the evidence of Stacy's prior act for the purpose of assessing "intent, knowledge, and absence of mistake." Although jury instructions may help reduce the risk of unfair prejudice from other-act evidence—especially when "customized to the case rather than boilerplate," *Gomez*, 763 F.3d at 860—when, as

here, "the government cannot explain how the prior conviction relates to the question of intent without resorting to a propensity inference, it would be unfair to expect the jury to do so based only on [a limiting] instruction," *Miller*, 673 F.3d at 702; *see Lee*, 724 F.3d at 980.

Nonetheless, we are persuaded that the error here was harmless. To determine whether an evidentiary error is harmless, the court must decide "'whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded.'" *Gomez*, 763 F.3d at 863 (quoting *United States v. Vargas*, 689 F.3d 867, 875 (7th Cir. 2012)). In *Gomez*, for example, we concluded that admission of cocaine found in Gomez's bedroom was harmless because additional evidence identifying him as the second person on incriminating phone calls "was quite compelling and would not have been less so had the other-act evidence been excluded." *Id.*

The same is true for the evidence of Stacy's intent to provide pseudoephedrine for use in manufacturing methamphetamine. Even before introduction of evidence about Stacy's prior acts, numerous witnesses testified about how they provided Stacy with pseudoephedrine pills for the purpose of making methamphetamine. The government backed up this testimony with purchase logs from local pharmacies. Multiple other witnesses, including two who admitted to manufacturing methamphetamine, testified that they had received pseudoephedrine pills from Stacy to make into methamphetamine. This testimony was enough for the jury to convict Stacy even without the evidence of his possession of methamphetamine in 2008.

Stacy concedes that there was sufficient evidence to convict him but insists that the admission of the bag of methamphetamine nonetheless prejudiced his case because of the powerful effect of physical evidence on a jury. This argument might be more persuasive if the bag was the only physical evidence linking him to the manufacture of methamphetamine, but it was not. The government showed the jury the scale found in Stacy's bedroom, along with analysis from a forensic scientist that there was methamphetamine residue on the scale and testimony confirming that the scale was used to weigh methamphetamine. The jury also saw the glass smoking pipe found at Stacy's arrest and heard testimony from a coconspirator about him using a pipe to smoke methamphetamine.

In light of this compelling evidence of Stacy's knowledge and intent, we are not convinced that the government's case would have been significantly less persuasive without the evidence of Stacy's prior drug possession. As in *Gomez*, the government's case here was strong, and the district court's error in admitting the evidence of prior acts under Rule 404(b) was harmless.

## B.  SENTENCING

Stacy concedes that the district court correctly determined the guidelines imprisonment range.[1] He argues, how-

---

[1] Stacy does contend that the probation officer miscalculated the base offense level for count one by converting the amount of pseudoephedrine directly into an amount of marijuana. Instead, he argues, the officer should have first converted the pseudoephedrine quantity to an amount of a mixture and substance containing methamphetamine using a yield rate discussed by Jordon Banker during trial. But Stacy admits that this issue did not affect the guidelines range because the offense level for counts two

ever, that the district court failed to consider whether the guidelines treat pseudoephedrine too harshly "based primarily on incorrect assumptions as to the quality of methamphetamine that would be produced from the pseudoephedrine." He contends that the court should have addressed whether the United States Sentencing Commission's adoption of a yield ratio of 50% for conversion of pseudoephedrine to methamphetamine unfairly results in stiffer punishment for those who procure pseudoephedrine than for those who actually make methamphetamine. *See* U.S.S.G. § 2D1.1, cmt. n.8(D) (listing conversion ratios to marijuana of 1g to 10kg for pseudoephedrine and 1g to 20kg for actual methamphetamine); *United States v. Martin*, 438 F.3d 621, 625 (6th Cir. 2006) (discussing adoption of 50% yield ratio).

Because Stacy never raised this argument in the district court, the government argues that our review is for plain error. Under that standard, reversal is warranted only if an error seriously affected "the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (quotations omitted); *see United States v. Newbern*, 633 F.3d 599, 602 (7th Cir. 2011). Stacy argues, however, that our review is for abuse of discretion because he challenges only the substantive reasonableness of his sentence. *See Gall v. United States*, 552 U.S. 38, 51 (2007); *United*

---

through five was 36 under U.S.S.G. § 2D1.11(d)(3)—when combined with the two-level increase for involvement of a minor—and that this offense level applied to count one under U.S.S.G. §§ 3D1.2(d) and 3D1.3(b). Because this issue did not affect the advisory sentencing range, we need not address it further.

*States v. Marin-Castano,* 688 F.3d 899, 902 (7th Cir. 2012). He acknowledges that, even under that standard, we apply a presumption of reasonableness to his sentence because it was within the guidelines range. *See Rita v. United States,* 551 U.S. 338, 347 (2007); *United States v. Smith,* 721 F.3d 904, 906 (7th Cir.), *cert. denied*, 134 S. Ct. 660 (2013).

We agree with the government that plain error applies. Although Stacy insists that his argument relates only to the facts of this case, his reasoning represents a fundamental policy disagreement with the Sentencing Commission's advisory drug ratios. After *Kimbrough v. United States*, 552 U.S. 85, 107–08 (2007), sentencing judges are free to deviate from the Commission's recommendations if they view an adopted policy as unjust. But when a defendant does not alert the district court to this type of policy concern, we have consistently reviewed appellate challenges on that basis for plain error. *See Newbern*, 633 F.3d at 601–02 (reviewing categorical challenge to career-offender guideline); *United States v. White*, 582 F.3d 787, 798–99 (7th Cir. 2009) (reviewing challenge to drug ratio for crack and powder cocaine after *Kimbrough*); *United States v. Taylor*, 520 F.3d 746, 746 (7th Cir. 2008) (same). Stacy has not presented a persuasive reason to depart from that precedent here.

This is not a situation where Stacy lacked an appropriate opportunity to raise his argument before the district court, as sometimes occurs when an issue develops for the first time during sentencing. *See United States v. Farmer*, 755 F.3d 849, 853–54 (7th Cir. 2014) (noting tension in cases about standard of review when defendant does not object to judicial decisions made without prior notice). Here, the presentence report put Stacy on notice that the guideline range would be

driven by the quantity of pseudoephedrine pills involved in his offenses. That Stacy failed to object after receiving this notice further supports application of plain-error review.[2]

In any event, Stacy's argument is not persuasive under either standard of review. He argues that Congress considers pseudoephedrine offenses "less serious" than the act of manufacturing methamphetamine, but that is not apparent. The statutory minimum and maximum penalties for manufacturing methamphetamine *are* generally harsher than those for possessing precursor chemicals like pseudoephedrine. *Compare* 21 U.S.C. § 841(b)(1)(A)–(C), *with id.* § 841(c). In 2000, however, Congress responded to the growing use of methamphetamine by, in part, directing the Sentencing Commission to ramp up penalties for offenses involving pseudoephedrine and other precursor chemicals, and to amend the conversion ratios accordingly. Methamphetamine Anti-Proliferation Act of 2000, Pub. L. No. 106-310, § 3651(b), 114 Stat. 1238–39. The Commission then enacted U.S.S.G. § 2D1.11 to target pseudoephedrine offenses and determined the yield rate of 50% for conversion of pseudoephedrine to methamphetamine. *See* U.S.S.G. app. C, Amendment 625, at 199 (Nov. 1, 2003). Stacy attacks the 50% ratio as meant to "approximate the amount of pure methamphetamine that a high-grade laboratory could produce." But the Commission based its ratio on a report from the Drug Enforcement Ad-

---

[2] In his objections to the presentence report, Stacy stated, without elaboration, that "the marijuana equivalent conversion ratio in the guidelines is suspect at best as pointed out in numerous decisions." But counsel said that he was "choos[ing] not to waste the Court's time in this regard" and, moreover, never raised any concern about the conversion ratio for pseudoephedrine to methamphetamine.

ministration about the typical yield rate *in clandestine labora-tories*. *See id.*; *Martin*, 438 F.3d at 625, 634–35 (explaining the basis for the conversion ratio and concluding district court's reliance on it was not plain error). Stacy thus fails to convince us that the district court plainly erred, or even acted unreasonably, by not mitigating his sentence based on unraised concerns about the conversion ratios.

Moreover, the district court gave a thorough explanation for its decision to impose a prison sentence within the guidelines range. The court addressed Stacy's primary mitigating argument about his advanced age but concluded that other § 3553(a) factors, particularly the seriousness of the scourge of methamphetamine and Stacy's extensive criminal history, warranted a sentence within the guidelines range. Thus, we see no reason to vacate Stacy's sentence.

Stacy's conviction and sentence are AFFIRMED.