In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3228

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

COLT V. LYNN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 4:13-cr-40077-JPG-1 — **J. Phil Gilbert**, *Judge.*

ARGUED OCTOBER 28, 2016 — DECIDED MARCH 24, 2017

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Colt Lynn was convicted of one count
of conspiracy to manufacture methamphetamine, in violation
of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2; and one count
of conspiracy to possess pseudoephedrine, in violation of 21
U.S.C. §§ 841(c)(2), 846 and 18 U.S.C. § 2. The court imposed
a below-guidelines sentence of 192 months' imprisonment.

Mr. Lynn contends that the district court erred in admitting two kinds of evidence at trial: (1) National Precursor Exchange System ("NPLEX") logs concerning pharmacy purchases of products containing pseudoephedrine, an ingredient in methamphetamine; and (2) a video of a chemist demonstrating a particular method for producing methamphetamine, known as "shake-and-bake." Mr. Lynn also contends that he should not have been sentenced as a career offender because his two predicate offenses for aggravated battery do not qualify as violent felonies.

We affirm. The district court did not err in allowing the introduction of the NPLEX logs because those records are nontestimonial. Similarly, although the "shake-and-bake" video showed a different, and perhaps more sophisticated, means of production, the video's presentation did not prejudice Mr. Lynn. Finally, the district court properly applied the career offender enhancement because Mr. Lynn's prior Illinois aggravated battery convictions were crimes of violence under U.S.S.G. § 4B1.2(a)(1).

# I

## BACKGROUND

### A.

On January 15, 2013, at about 3:00 a.m., Mr. Lynn called Sheriff Jerry Suits of Pope County, Illinois. He told the Sheriff that, he, along with Ryan Carey, Amy Ficker, and Sarah Horton, had been cooking and using methamphetamine in a house on Madison Street in Golconda, Illinois. Mr. Lynn expressed concern that some of the people in the house wanted

to continue using methamphetamine even though young children recently had returned to the house. Mr. Lynn specifically admitted to Sheriff Suits that he had been "involved in it, too" and that he "ha[d] cooked some in there and, yeah, [he] ha[d] used it."[1]

Based on this call, Sheriff Suits immediately initiated an investigation. He called several members of his team, including Officer Josh Moore. Sheriff Suits asked Officer Moore to check the NPLEX logs to see if anyone in the home had purchased Sudafed. NPLEX logs track lawful purchases of products containing pseudoephedrine, which is a necessary ingredient in methamphetamine.

In addition to checking the logs, Sheriff Suits sent officers to the Madison Street home. His "number one goal was to do the welfare check on the kids."[2] His secondary goal was to "smell around and go[] through the bedroom and see if [he] could smell anything."[3] Around 4:40 a.m., police officers approached the house. Eventually, one of the occupants opened the door, and the officers entered to complete a welfare check. After speaking with at least two adults, Ficker and Horton, Sheriff Suits called the Pope County State's Attorney, Melissa Presser. The Sheriff advised her of the information that he had received from Mr. Lynn on site and from the NPLEX logs, which showed that Carey and Horton recently had purchased pseudoephedrine. At approximately 8:00 a.m., the police executed a valid warrant to search the property.

---

[1] R.196 at 20.

[2] *Id.* at 25.

[3] *Id.*

During the search, the police found remnants of a meth-amphetamine lab in the home's basement and evidence of methamphetamine manufacturing and use elsewhere in the house. The home's tenant, Carey, told Sheriff Suits and the other officers that he and the other occupants of the house, Horton and Ficker, had been manufacturing and using meth-amphetamine with Mr. Lynn earlier that day.

Carey and Horton subsequently were convicted in Illinois state court and agreed to cooperate with federal authorities to avoid federal prosecution.

**B.**

Based on the events of January 15, 2013, a grand jury in the Southern District of Illinois indicted Mr. Lynn and charged him in a three-count indictment with charges related to a conspiracy to manufacture and distribute methamphetamine.[4] Mr. Lynn pleaded not guilty, and the parties prepared for trial.

On January 29, 2014, the Government filed a notice of intent to introduce the NPLEX records under Federal Rules of Evidence 803(6) and 902(11). Mr. Lynn filed a response to the Government's notice of intent on February 19, 2014; he objected to the introduction of NPLEX records on two grounds. First, Mr. Lynn argued that NPLEX records are documents

---

[4] Specifically, Mr. Lynn was charged with one count of conspiracy to manufacture and to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2; one count of conspiracy to possess pseudoephedrine, in violation of 21 U.S.C. §§ 841(c)(2), 846 and 18 U.S.C. § 2; and one count of possession of pseudoephedrine, in violation of 21 U.S.C. § 841(c)(2).

prepared in anticipation of litigation and, as such, do not fall within the exception to the hearsay rule. Second, Mr. Lynn argued that admitting the records would violate his right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004). The Government did not respond to this filing, and the district court made no findings on the admissibility of the records.

Mr. Lynn's jury trial began on June 22, 2015. Sheriff Suits was the first witness to testify. Sheriff Suits testified about the phone call he had received from Mr. Lynn on January 15, 2013, and also described the small methamphetamine laboratory found in the basement of Carey's house.

Officer Moore testified as well. He stated that he had checked the NPLEX logs after the welfare check in preparation to secure a search warrant for the premises. From the NPLEX logs, he had learned that Carey and Horton recently had purchased pseudoephedrine. Carey's records revealed that he had purchased pseudoephedrine twice between January 11 and 15, 2013. In his testimony, Carey explained that, a few weeks prior to January 15, he and Mr. Lynn had used a quarter gram of methamphetamine with Ficker and Horton. When Carey asked if Mr. Lynn could get more, Mr. Lynn said that he knew how to cook methamphetamine. Carey purchased the pseudoephedrine, and, between January 11 and 15, Carey "cooked" methamphetamine twice with Mr. Lynn by mixing the ingredients in a jug and shaking it.[5] Horton also confirmed that she, Mr. Lynn, Carey, and Ficker had been using methamphetamine together in January of 2013.

---

[5] R.196 at 88–89.

The Government also presented an expert witness, Officer William Brandt Blackburn. Officer Blackburn was a member of the Illinois State Police Meth Response Team and testified that he believed that Mr. Lynn had used the "shake-and-bake" method to cook methamphetamine.[6] The Government played a silent video of a chemist using the "shake-and-bake" method in a laboratory setting, while Officer Blackburn explained that method. Officer Blackburn admitted that this video may differ from Mr. Lynn's actual experience. For example, he noted that the amount of methamphetamine produced varies, and that, outside of a laboratory, someone using this method may employ another type of drain cleaner, table salt, or muriatic acid and aluminum foil to get the same result. Officer Blackburn also explained that the video depicted a chemist using test tubes and laboratory equipment, but that, outside this setting, a methamphetamine cook would use anything from a bottle to a jar to a bowl to produce methamphetamine.

Following this testimony, the Government rested its case-in-chief. Mr. Lynn moved for a judgment of acquittal, which the district court denied. The defense then rested, and the case was submitted to the jury. The jury found Mr. Lynn guilty of both counts.[7]

---

[6] R.197 at 8.

[7] Mr. Lynn also was charged with possession of pseudoephedrine in violation of 21 U.S.C. § 841(c)(2). The United States moved to dismiss this third count at the completion of trial, and the parties went to verdict on Counts 1 and 2.

**C.**

The presentence report ("PSR") concluded that Mr. Lynn was a career offender under section 4B1.1 of the United States Sentencing Guidelines. This determination was based on two prior convictions for crimes of violence, including two convictions of aggravated battery under Illinois law in 2007. Applying the career offender guideline, the PSR calculated Mr. Lynn's offense level at 32 and his advisory sentencing range at 210 to 262 months. The PSR did not suggest a basis for a sentence below the guidelines range.

If Mr. Lynn had not been classified as a career offender, his total offense level would have been 18, and the applicable guidelines range would have been 57 to 71 months. Defense counsel filed a motion in support of a variance and requested a sentence of 60 months in prison. In that motion, defense counsel noted the difference between the career offender guideline range and the guideline range for the offenses of conviction. He argued that the prior convictions should be considered related and insufficiently serious to warrant a sentence within the career offender guidelines range. He also argued that Mr. Lynn should receive a lower sentence because none of the methamphetamine involved was intended for distribution. Finally, the motion noted that, if Mr. Lynn had not called Sheriff Suits, the present case would not have been brought.

The district court accepted the PSR's unchallenged calculation and, after considering the 18 U.S.C. § 3553(a) factors, imposed a below-guidelines sentence of 192 months' imprisonment. Mr. Lynn timely appeals his conviction and sentence.

## II

## DISCUSSION

Mr. Lynn's appeal of his conviction rests on his claim that the district court erred in admitting the NPLEX logs and the "shake-and-bake" video. With respect to his sentence, Mr. Lynn claims that the career offender guideline was applied improperly because his prior aggravated battery convictions do not qualify as "crimes of violence." We address these issues in turn.

### A.

We examine first whether the district court erred in admitting the NPLEX records. The parties dispute the appropriate standard of review. Mr. Lynn contends that his pretrial objection was sufficient to trigger de novo review. The Government asserts that we should review for plain error because Mr. Lynn did not renew his objection at trial.

The governing principles are clear. We review de novo a preserved challenge to the admissibility of evidence under the Confrontation Clause. *United States v. Garcia*, 754 F.3d 460, 471 (7th Cir. 2014). Unpreserved objections, however, are reviewed for plain error. Fed. R. Evid. 103(e).[8] Federal Rule of Evidence 103(b) allows a party to rest on a pretrial motion and does not require a renewed objection in specific circumstances: "[o]nce the court *rules definitively on the record* … a party need not renew an objection or offer of proof to preserve

---

[8] *See also United States v. Phillips*, 596 F.3d 414, 418 (7th Cir. 2010); *United States v. Jumper*, 497 F.3d 699, 703 (7th Cir. 2007).

a claim of error on appeal." Fed. R. Evid. 103(b) (emphasis added). Here, Mr. Lynn timely raised his objection to admissibility in a pretrial motion before the district court; however, he admits, "the district court made no findings on the admissibility of the [NPLEX] records."[9] In the absence of such a decision, Mr. Lynn needed to renew his objection at trial for the objection to be preserved. *See United States v. Phillips*, 596 F.3d 414, 418 (7th Cir. 2010); *United States v. Gajo*, 290 F.3d 922, 927 (7th Cir. 2002). We therefore review for plain error.

Under plain-error review, a defendant must show that (1) there was error; (2) it was plain rather than subject to reasonable dispute; (3) it affected his substantial rights; and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732–36 (1993). We therefore begin our analysis with whether the district court erred.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. This Clause guarantees, however, only a defendant's right to confront those who "bear testimony" against him. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Nontestimonial evidence is not protected by the Clause. *Id.* at 56, 68. *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* at 68. More recently, the Supreme Court explained that business and public records are "generally admissible absent confrontation" be-

---

[9] Appellant's Br. 5.

cause, "having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial[,] they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Mr. Lynn maintains that the NPLEX records are testimonial because "[t]he only purpose of keeping track of pseudoephedrine purchases is to determine whether individuals are violating the law by purchasing more pseudoephedrine than legally allowed."[10]

We have not addressed directly this issue. However, other circuits have concluded that NPLEX records are nontestimonial. *See United States v. Collins*, 799 F.3d 554, 585–86 (6th Cir. 2015); *United States v. Towns*, 718 F.3d 404, 410–11 (5th Cir. 2013); *United States v. Mashek*, 606 F.3d 922, 930 (8th Cir. 2010). In *Mashek*, for instance, the Eighth Circuit concluded that *Melendez-Diaz* does not provide "any relief" to defendants challenging pseudoephedrine logs because the logs are "kept in the ordinary course of business pursuant to [state] law." 606 F.3d at 930. Similarly, in *Towns*, the Fifth Circuit concluded that NPLEX records did not present a Confrontation Clause issue because

> [t]he pharmacies created these purchase logs *ex ante* to comply with state regulatory measures, not in response to an active prosecution. Additionally, requiring a driver's license for purchases of pseudoephedrine deters crime. The state thus has a clear interest in businesses creating these logs that extends beyond their evidentiary value.

---

[10] *Id.* at 19.

718 F.3d at 411; *see also Collins*, 799 F.3d at 585–86 (observing that "the MethCheck reports at issue in this case were not made to prove the guilt or innocence of any particular individual, nor were they created for solely evidentiary purposes" and therefore holding that the district court had "not commit[ted] plain error in violation of the Confrontation Clause by allowing their admission at trial").

This reasoning is persuasive. The laboratory reports at issue in *Melendez-Diaz* could not be used absent confrontation because they were prepared by an analyst for the express purpose of determining whether a previously seized substance contained cocaine. *See* 557 U.S. at 308. Unlike those reports, which were "prepared specifically for use at petitioner's trial," *id.* at 324, NPLEX logs are regularly maintained and updated each time an individual purchases an over-the-counter cold medicine that includes pseudoephedrine.[11] And, as the Fifth Circuit noted, state regulatory bodies may have legitimate interests in maintaining these records that far exceed their evidentiary value in a given case. For example, requiring identification for each pseudoephedrine purchase may deter misuse or pseudoephedrine-related drug offenses. The NPLEX logs therefore are nontestimonial, and the Confrontation Clause poses no barrier to their introduction.

---

[11] R.109-1 at 5 ("Purchasers must provide identification and sign a log each time they purchase. These logs are subject to review by law enforcement personnel for the purpose of enforcing legislative requirements.").

**B.**

Mr. Lynn next claims that the district court should not have allowed the Government to play a video depicting the "shake-and-bake" method of manufacturing methamphetamine because the video was unduly prejudicial. Both parties agree that we review for plain error because Mr. Lynn did not object to the video at trial. *United States v. Price*, 418 F.3d 771, 779 (7th Cir. 2005); *see also* Fed. R. Crim. P. 52(b); Fed. R. Evid. 103(e).

Federal Rule of Criminal Procedure 52(b) "provides a court of appeals a limited power to correct errors that were … not timely raised in district court." *Olano*, 507 U.S. at 731. Under Rule 52(b), there must be an "error" that is "plain" and that affects a defendant's "substantial rights." Fed. R. Crim. P. 52(b). "An error is not plain 'unless [it] is clear under current law' and not 'subject to reasonable dispute.'" *United States v. Resnick*, 823 F.3d 888, 896 (7th Cir. 2016) (alteration in original) (quoting *Olano*, 507 U.S. at 734). The rule also "leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and [we] should not exercise that discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (second alteration in original) (internal quotation marks omitted); *see also United States v. Stacy*, 769 F.3d 969, 976 (7th Cir. 2014).

Federal Rule of Evidence 402 states that, generally, all "[r]elevant evidence is admissible" and that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. This broad language favoring relevance is limited by Rule

403, which permits courts to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The district court enjoys wide discretion in applying Rule 403. *United States v. Rogers*, 587 F.3d 816, 823 (7th Cir. 2009).

Here, although the "shake-and-bake" video showed a different, and perhaps more sophisticated, example of production than Mr. Lynn actually employed, we cannot say that the presentation was not informative for the jury, nor can we say that the video itself was prejudicial to Mr. Lynn. The trial transcript makes clear that the video was not meant to depict Mr. Lynn's exact experience. Instead, the video demonstrated that common household items, including lithium batteries, ice packs, and Sudafed, can be used to cook methamphetamine using the "shake-and-bake" method. Indeed, after the video concluded, Officer Blackburn explained what the police had located in the basement of Carey's house and described those findings as "the remnants of a shake-and-bake meth lab."[12]

Officer Blackburn's testimony was consistent, moreover, with that of Mr. Lynn's coconspirators, Sheriff Suits, and other witnesses. For example, Mr. Lynn's coconspirator, Carey, testified that he had used methamphetamine with Mr. Lynn and that he purchased pseudoephedrine twice to make methamphetamine with Mr. Lynn. Additionally, Sheriff Suits testified that Mr. Lynn called him, admitted that he

---

[12] R.197 at 23–24.

had been "involved" in using methamphetamine at the residence and that he "ha[d] cooked some in there."[13] A second alleged coconspirator, Horton, also testified that she, Mr. Lynn, Carey, and Ficker had been using methamphetamine together in January 2013.[14]

In light of this evidence, the "shake-and-bake" video was not unduly prejudicial. We therefore conclude that the district court did not commit plain error in failing to exclude the "shake-and-bake" video at trial.

## C.

The district court determined that Mr. Lynn was a career offender based on two prior state court convictions, both for aggravated battery on a public way. Mr. Lynn now asserts that these convictions do not qualify as "crimes of violence" for purposes of the career offender guideline. *See* U.S.S.G. § 4B1.2. Because Mr. Lynn did not object to this designation in the district court, we review for plain error. *United States v. Scanlan*, 667 F.3d 896, 899 (7th Cir. 2012).

The career offender enhancement applies to any defendant who is at least eighteen years old at the time he committed the offense, whose offense is a "crime of violence or a controlled substance offense," and who has at least two prior felony convictions for either a crime of violence or a controlled

---

[13] R.196 at 18–20.

[14] *Id.* at 130–31.

substance offense. *See* U.S.S.G. § 4B1.1(a).[15] Mr. Lynn challenges only whether the district court was correct in concluding that his two prior convictions for aggravated battery, both under 720 ILCS 5/12-4(b)(8),[16] are crimes of violence.

Just last term, the Supreme Court reaffirmed that sentencing courts should apply the categorical approach in determining whether a particular state crime qualified as a "violent felony" for purposes of 18 U.S.C. § 924(e)(1).[17] *Mathis v. United*

---

[15] The Guidelines define a "crime of violence" in two ways. The first, commonly called the "force clause," includes any offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1). The second, referred to as the "residual clause," includes "burglary of a dwelling, arson, or extortion, [offenses] involv[ing] use of explosives, or otherwise involv[ing] conduct that presents a serious potential risk of physical injury to another." *Id.* § 4B1.2(a)(2). The PSR classified Mr. Lynn's convictions as violent felonies under the "force clause." *See* R.212 at 11.

[16] After Mr. Lynn's convictions, Illinois renumbered this section of its code. Aggravated battery is now found at 720 ILCS 5/12-3.05.

[17] We have held that the Court's jurisprudence with respect to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), applies with equal force to our interpretation of the "closely analogous" career offender guideline. *See United States v. Woods*, 576 F.3d 400, 403 (7th Cir. 2009).

The Supreme Court's recent decision in *Beckles v. United States*, No. 15-8544 (U.S. Mar. 6, 2017), does not alter our approach. In *Beckles*, the petitioner had brought a habeas petition challenging as "void for vagueness" the residual clause of U.S.S.G. § 4B1.2(a)(2), which defines a "'crime of violence' as an offense that 'involves conduct that presents a serious potential risk of physical injury to another.'" Slip op. at 1. The Supreme Court held "that the advisory Guidelines are not subject to vagueness challenges under the Due Process Clause." *Id.*

*States*, 136 S. Ct. 2243 (2016). At issue in *Mathis* was whether burglary under Iowa law constituted the "generic" form of burglary referenced in the Armed Career Criminal Act ("ACCA") and, therefore, qualified as a violent felony.[18] The Court noted that, in specifically enumerating "burglary, arson, [and] extortion," in the statute, Congress was referring only to the usual or generic versions of those crimes, not to all variants of the offenses. *Id.* at 2247–48. Thus, to determine whether a prior conviction for burglary constituted "generic burglary … [,] courts apply what is known as the categorical

---

In our case, Mr. Lynn was sentenced under U.S.S.G. § 4B1.2(a)(1), which defines a crime of violence as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." He was not sentenced under the residual clause. *Beckles* therefore does not impact Mr. Lynn's sentence. Moreover, in *Beckles*, the Court does not, in any way, suggest that the categorical approach and modified categorical approach, *see infra* at 17–18, which it employs when analyzing the ACCA, does not apply with equal force to the language of § 4B1.2.

[18] Using language analogous to that in U.S.S.G. § 4B1.2, the ACCA defines "violent felony" as

> any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—
>
> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another … .

18 U.S.C. § 924(e)(2)(B).

approach: They focus solely on whether the elements of the crime of conviction sufficiently match the elements of generic burglary, while ignoring the particular facts of the case." *Id.* at 2248 (citing *Taylor v. United States*, 495 U.S. 575, 600–01 (1990)). The Court clarified that "elements" are "the things the 'prosecution must prove to sustain a conviction.' … At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant." *Id.* Thus,

> [a] crime counts as "burglary" under the Act if its *elements* are the same as, or narrower than, those of the generic offense. But if the crime of conviction covers any more conduct than the generic offense, then it is not an ACCA "burglary"—even if the defendant's actual conduct (*i.e.*, the facts of the crime) fits within the generic offense's boundaries.

*Id*. (emphasis in original).

Sometimes, however, it is necessary to go beyond the statutory provisions to determine if a particular state crime is a crime of violence. In *Mathis*, the Supreme Court noted that some statutes "have a more complicated … structure, making the comparison of elements harder. A single statute may list elements in the alternative, and thereby define multiple crimes." *Id*. at 2249 (citing *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013)). To address the sentencing court's need to determine which of the alternative elements "was integral to the defendant's conviction," the Court explained how it had adopted a "modified categorical approach for use with statutes having multiple alternative elements." *Id.* (quotation marks omitted) (citing *Shepard v. United States*, 544 U.S. 13, 26 (2005)). "Under that approach, a sentencing court looks to a

limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Id*.

The Court cautioned that the modified categorical approach should be employed only when a statute "list[s] multiple elements disjunctively," *not* when it simply "enumerates various factual means of committing a single element." *Id*. "Because that kind of list merely specifies diverse means of satisfying a single element of a single crime—or otherwise said, spells out various factual ways of committing some component of the offense—a jury need not find (or a defendant admit) any particular item." *Id*. Turning to the statute before it, the Court concluded that the Iowa burglary statute falls into this latter category. Although the generic offense of burglary requires "unlawful entry into a building or other structure," Iowa's burglary statute could be violated by unlawful entry into "any building, structure, [or] land, water or air vehicle." *Id*. at 2250 (alteration in original). Because the Supreme Court of Iowa had held that these terms were "alternative method[s] of committing [the] single crime of burglary," and "that a jury need not agree on which of the locations was actually involved," the terms did not qualify as "elements." *Id.* (internal quotation marks omitted). Consequently, the sentencing court had erred in looking beyond the statute to the underlying documentation to determine the factual method the defendant had used to commit the crime.

Applying this approach to Mr. Lynn's convictions for aggravated battery, it is clear that we may look beyond the statutory language to determine if his convictions qualify as violent felonies. Mr. Lynn was convicted in Illinois state court of

two counts of aggravated battery under 720 ILCS 5/12-4(b)(8). At the time of his convictions, the Illinois Aggravated Battery Statute provided:

> § 12-4. Aggravated Battery
>
> (a)      A person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery.
>
> (b)      In committing a battery, a person commits aggravated battery if he or she:
>
> …
>
> (8) Is, or the person battered is, on or about a public way, public property or public place of accommodation or amusement; … .

720 ILCS 5/12-4(b)(8). Moreover, "[t]o establish aggravated battery, the State must first prove that the defendant committed a simple battery. That is, the State must establish that the defendant 'intentionally or knowingly without legal justification … cause[d] bodily harm … or ma[de] physical contact of an insulting or provoking nature with an individual.'" *People v. Ojeda*, 921 N.E.2d 490, 492 (Ill. Ct. App. 2009) (quoting 720 ILCS 5/12-3). Other than adding gender inclusive language, the battery statute has not changed since 2007; it provides: "Sec. 12-3. Battery. (a) A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3.

We have held that "a conviction under the first prong of the Illinois battery statute, 720 ILCS 5/12-3, which requires that the person 'causes bodily harm,' has as an element 'the use, attempted use, or threatened use of physical force.'" *Hill v. Werlinger*, 695 F.3d 644, 649 (7th Cir. 2012). However, there is more than one way of committing battery: it can be committed by "(1) caus[ing] bodily harm to an individual or (2) mak[ing] physical contact of an insulting or provoking nature with an individual." *United States v. Rodriguez-Gomez*, 608 F.3d 969, 973 (7th Cir. 2010) (quoting 720 ILCS 5/12-3). These alternative methods are not simply "factual means of committing a single element." *Mathis*, 136 S. Ct. at 2249. Rather, they are elements, one of which must be proved beyond a reasonable doubt in order to sustain a conviction for battery. *See People v. Nichols*, 979 N.E.2d 1002, 1013–14 (Ill. Ct. App. 2012) (identifying contact insulting or provoking in nature as an element of aggravated battery that must be proved beyond a reasonable doubt).

Because under Illinois law there are alternative elements of the crime of battery, we must "figur[e] out which of the alternative elements … 'was integral to the defendant's conviction.'" *Mathis*, 136 S. Ct. at 2249. The modified categorical approach is, therefore, appropriate. Under that approach, we look to the underlying documentation to determine if Mr. Lynn was charged with aggravated battery because he "caused bodily harm," in which case the crime qualifies as a crime of violence, or because he "made physical contact of an insulting or provoking nature," in which case the crime would fall outside definition of a crime of violence.

Indeed, in other cases, we have employed this very approach with respect to convictions for aggravated battery under Illinois law. In *Rodriguez-Gomez*, we reasoned:

> Because there is more than one way of committing battery (either by causing bodily harm or by making physical contact that is insulting or provoking), the mere fact that Rodriguez was convicted of aggravated battery does not tell us whether he committed a crime that necessarily involved force. Accordingly, we must determine whether Rodriguez was convicted under the first or second prong of the battery statute. *United States v. Gilbert*, 464 F.3d 674, 678 (7th Cir. 2006). The scope of our inquiry is limited to (1) admissions made by the defendant, and (2) the charging document, plea agreement, plea colloquy, and comparable judicial records from the conviction. *Shepard v. United States*, 544 U.S. 13, 16 (2005) (citing *Taylor v. United States*, 495 U.S. 575 (1990)). Our purpose is to determine what form of the offense Rodriguez committed, not how he happened to commit the crime; that is, we want to know whether Rodriguez's conviction necessarily reflects a finding that force (actual, threatened, or attempted) was used in the commission of the offense.

608 F.3d at 973. Thus, we had to look to judicial records to determine which elements had been charged and proven. *Id.*; *see also Hill*, 695 F.3d at 649 (looking to the information and jury instructions to determine whether the petitioner had

been "charged and convicted under the first prong of the battery statute"); *United States v. Aviles-Solarzano*, 623 F.3d 470, 473 (7th Cir. 2010) (noting that, in deciding whether a defendant's conviction for aggravated battery on a public way was a crime of violence, the sentencing court could look to "the charging document" to determine what type of battery the defendant had committed).

Here, Mr. Lynn maintains that these authorities are not controlling. Instead, he submits, we should be guided by *United States v. Evans*, 576 F.3d 766 (7th Cir. 2009).[19] *Evans*, however, did not concern whether we could look beyond the fact of conviction to determine which elements of battery had been alleged and proven. Instead, we were faced with the question whether the element of "contact of an insulting or provoking nature" itself was divisible such that we could look beyond the element charged to the underlying facts that satisfied that element. *Id.* at 767.

Specifically, in *Evans*, we confronted the question whether a defendant's aggravated battery for battery "know[ing] the individual harmed [wa]s pregnant," qualified as a violent felony. *Id.* We first noted that, under Illinois law, a person could commit battery either by "(1) caus[ing] bodily harm … or (2) mak[ing] physical contact of an insulting or provoking nature with an individual." *Id.* Although we did not articulate each step in our decisionmaking process, we employed the modified categorical approach to determine which type of battery Evans had committed: "caus[ing] bodily harm" or "contact of

_____

[19] Mr. Lynn also invites our attention to *United States v. Johnson*, 365 F. App'x 3 (7th Cir. 2010).

an insulting or provoking nature." *Id.* According to the indictment, the defendant had "knowingly and without legal justification, made contact of an insulting or provoking nature … in that the defendant pushed [the victim], knowing [her] to be pregnant." *Id.* In other words, the simple battery underlying Evans's aggravated battery was charged under the "*making physical contact of an insulting or provoking nature*," not "causing bodily harm." *Id.* at 769. Because this single element—"insulting or provoking physical contact"—could embrace both a merely offensive contact and a truly forcible battery, we could not look further to the actions of Evans in committing the crime to determine if a forcible battery occurred. *Id.*[20]

In short, *Evans* concerned the question whether the single element of "contact of an insulting or provoking nature" was divisible; we concluded it was not. Here, by contrast, the

---

[20] *Johnson* also interpreted the element of the battery statute involving contact of an "insulting or provoking nature." We noted that *Johnson*'s situation was indistinguishable from that which the court had decided in *United States v. Evans*, 576 F.3d 766 (7th Cir. 2009):

> In *Evans*, we noted that the terms "insulting" or "provoking" derived from the common law tort of battery. Battery can be offensive (such as spitting on a person) or forcible (such as pushing a person to the floor)—and only the latter is a crime of violence. 576 F.3d at 768–69. But the statute is not divisible—that is, the same words, "insulting or provoking," describe both a violent and nonviolent way of committing the crime. Thus, we could examine only which crime the defendant committed, not how he committed that crime.

365 F. App'x at 5.

question is not what *facts* occurred that establish a single element of battery. Instead, the question is what elements of the battery statute the State proved in securing Mr. Lynn's convictions for aggravated battery. As the Court explained in *Mathis*, when, as here, the sentencing court needs to "figur[e] out which of the alternative elements … was integral to the defendant's conviction," the modified categorical approach is the appropriate methodology. *Mathis*, 136 S. Ct. at 2249.

Looking to the underlying documentation, the information for the first aggravated battery charged that Mr. Lynn "knowingly caused bodily harm" to the victim.[21] The same language was employed in the second aggravated battery charge. Because both of Mr. Lynn's convictions for aggravated battery involved the first prong ("causing bodily harm") of the battery statute, and because we have held that this element constitutes "the use, attempted use, or threatened use of physical force," *Hill*, 695 F.3d at 649 (internal quotation marks omitted), Mr. Lynn's Illinois convictions for aggravated battery were properly classified as violent felonies under U.S.S.G. § 4B1.2(a)(1).

We need only address one final issue: the fact that the underlying state court documents were not before the district court. The district court based Mr. Lynn's career offender enhancement on summaries within the PSR. Generally, "[a]n unsubstantiated summary of an indictment in a presentence investigation report does not satisfy the Supreme Court's requirement of a judicial record and thus is not … a proper basis

---

[21] App. R.40-2 at 7; App. R.40-3 at 6. The underlying state court documents were provided by the Government in a supplemental filing.

for classifying a defendant's prior crimes for purposes of federal sentencing." *Aviles-Solarzano*, 623 F.3d at 474. But a district court may consider stipulated facts, including those related to the defendant's criminal record, when deciding an appropriate sentence. *Id.* at 475. "There is no reason to go digging for a state-court indictment if the parties agree on what it says." *Id.*; *see also* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court … may accept any undisputed portion of the presentence report as a finding of fact.").

Here, the district court had only the PSR when it found that Mr. Lynn's prior convictions qualified as violent felonies. Mr. Lynn did not object to the PSR, and, consequently, "[t]he judge could [have] reasonably assume[d] that the defendant's lawyer was satisfied that the summary was accurate." *Aviles-Solarzano*, 623 F.3d at 476. It was not error, therefore, for the district court to rely on this document. Moreover, if Mr. Lynn had objected, the Government could have produced the underlying documentation.[22] Indeed, at our request, the Government produced these documents following oral argument, which establish that Mr. Lynn's convictions for aggravated battery involved the element of "caus[ing] bodily harm."[23] We therefore conclude that the district court did not commit plain error in applying the career offender enhancement.

---

[22] Appellee's Br. 32 n.7.

[23] App. R.40-2 at 7; App. R.40-3 at 6.

**Conclusion**

Because the district court did not commit plain error in admitting the NPLEX records, in admitting the "shake-and-bake" video, and in concluding that Mr. Lynn's two prior convictions for aggravated battery were "crimes of violence" under the Sentencing Guidelines, the judgment is affirmed.

AFFIRMED