In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-3318

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RANDY WILLIAMS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:17-cr-20049 — **Sara Darrow**, *Chief Judge*.

ARGUED DECEMBER 6, 2019 — DECIDED FEBRUARY 11, 2020

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. On July 28, 2016, two men entered a Sprint store with a gun, threatened and zip-tied all witnesses, grabbed some merchandise, and fled the store in two vehicles. Randy Williams was one of the getaway drivers. He was caught and indicted for obstruction of commerce by robbery under 18 U.S.C. § 1951.

Williams pleaded not guilty. Judge Colin S. Bruce presided over his jury trial, and, on June 14, 2018, the jury found Williams guilty. A few months later, it became public that Judge Bruce had engaged in ex parte communications with members of the United States Attorney's Office for the Central District of Illinois (the "Office"). As a result, all criminal cases assigned to Judge Bruce were reassigned to other judges. Williams's case was reassigned to now Chief Judge Darrow who presided over his sentencing hearing and sentenced him to 180 months' imprisonment.

Williams now appeals his conviction and sentence. He argues that Judge Bruce's ex parte communications with the Office violated his due process rights and the federal recusal statute, warranting a new trial. We conclude that Judge Bruce did not violate Williams's due process rights on the facts before us. And although Judge Bruce's conduct created an appearance of impropriety violating the federal recusal statute, there is no evidence of actual bias in this case to justify a new trial.

As to his sentence, Williams contends that he is entitled to a new sentencing hearing because Chief Judge Darrow improperly found that he was a career offender and was subject to a firearm enhancement. Williams does not qualify as a career offender, but the district court's finding otherwise was not plain error. Chief Judge Darrow thoroughly considered the § 3553(a) factors, made clear that she would impose the same sentence even if the career offender provision did not apply, and explained her reasons for this position. Because there was sufficient evidence regarding the use of a firearm during the crime, we also hold that the district court did not err in applying a firearm enhancement. We affirm his

conviction and sentence. We also grant Williams's unopposed motion to supplement the record on appeal.

## I. Background

In June 2018, Judge Bruce presided over Williams's trial where a jury found him guilty of robbery. At trial, Assistant United States Attorneys Elham Peirson and Ryan Finlen represented the government with the assistance of paralegal Staci Klayer.

Before his appointment to the district court, Judge Bruce had worked as a federal prosecutor in the Office for twenty-four years and, not surprisingly, maintained friendships with some of his former colleagues while on the bench. In August 2018, a newspaper reported that Judge Bruce had engaged in ex parte communications with the Office during the criminal trial of *United States v. Nixon*, a case over which Judge Bruce presided. In those emails, Judge Bruce criticized the prosecutor (Peirson) as being "entirely unexperienced" turning a "slam-dunk" case into a "60-40" for the defendant. As a result of the news coverage and the aftermath, then Chief Judge Shadid removed Judge Bruce from all cases involving the Office.

The Judicial Council of the Seventh Circuit appointed a Special Committee to review the judicial misconduct complaints filed against Judge Bruce based on his ex parte communications with the Office. The Special Committee requested and reviewed documents, conducted interviews, and held a hearing at which Judge Bruce testified. In response to the Special Committee's document request, the Office conducted a review to determine whether other ex parte communications existed. It subsequently disclosed to the

Special Committee approximately 1,230 communications be-
tween Judge Bruce and members of the Office. The Special
Committee determined that, although many of them ap-
peared to be innocuous, approximately 100 of these commu-
nications constituted potential ex parte communications
about cases pending before Judge Bruce. Some of them con-
cerned warrant approvals, successful appeals in one of Judge
Bruce's cases, scheduling matters, or a defendant's conduct
on bond, often with Klayer. In others, Judge Bruce addressed
former colleagues, including Klayer, by nicknames and con-
gratulated them on favorable outcomes. And in some com-
munications, Judge Bruce reassured former colleagues after
they made filing mistakes. In one instance, he stated "My
bad. You're doing fine. Let's get this thing done." In another,
he suggested that Klayer call the First Assistant "and advise"
while noting that luckily "they have an understanding judge
who doesn't get angry." None of these communications per-
tained to Williams's case.

The Special Committee then submitted to the Judicial
Council a report explaining its findings and recommenda-
tions, which the Judicial Council adopted. The Special
Committee saw "no evidence and received no allegation that
Judge Bruce's conduct or ex parte communications impacted
any of his rulings or advantaged either party." *In re Com-
plaints Against Dist. Judge Colin S. Bruce*, Nos. 07-18-90053, 07-
18-90067 (7th Cir. Jud. Council May 14, 2019). "And with the
exception of the *Nixon*-related and appeal-related emails,"
the Special Committee saw "no evidence of Judge Bruce dis-
cussing the merits of pending cases with the Office ex parte."
*Id.* The Judicial Council publicly reprimanded Judge Bruce
and kept him unassigned from any cases involving the Of-
fice until September 1, 2019.

Months before the Special Committee issued its report, Williams's case was reassigned to Chief Judge Darrow, who presided over his sentencing hearing. Williams and his counsel reviewed Williams's revised presentence investigation report ("PSR") and had no objections to it. The PSR calculated a total offense level of 32 and a criminal history category of VI, noting that "as the defendant is a career offender, a criminal history category of VI shall apply pursuant to USSG §4B1.1(b)." The advisory Guidelines range was calculated at 210 to 240 months, and both sides agreed to the district court's recitation of the Guidelines provisions. Williams's counsel never requested a below Guidelines sentence; he requested a sentence at the bottom of the Guidelines range.

At sentencing, Chief Judge Darrow considered the § 3553(a) factors. She noted that this offense is "as serious as it gets." The offense involved terrorizing individuals at gunpoint with explicit threats and physically restraining them with zip-ties just to steal cellphones. The district court determined that the following enhancements were adequate: 20 levels for the robbery, 6 levels for the firearm, 2 levels for physically restraining the victims, and 1 level for the value of stolen property.

For his role in the offense, the district court determined that a role adjustment was not appropriate. Williams fully participated in the crime and knew what the other participants were doing inside the store. Although Williams's conduct was not as culpable as the person who used the gun during the robbery, he was more culpable than the person who merely loaned them the car.

The district court next considered Williams's personal history and characteristics. The district court noted that he is a career offender because he has prior convictions for delivery of a controlled substance and aggravated sexual abuse. She stated that the resulting Guidelines range may be too high given his age and criminal record. But she concluded that Williams still represents a "very strong recidivism concern" in part because of his criminal history. "[T]here's a trend here of more serious criminal conduct" over time "and this is the most serious." Williams had also violated every term of supervised release, except the most recent one. Given her duty to protect the public, a hope that a longer sentence would deter him from committing future crimes, and his role in this serious offense, the district court sentenced him to 180 months' imprisonment. In imposing a below Guidelines sentence, the district court expressly stated that she would impose the same sentence even if the career offender provision did not apply. Williams now appeals both his conviction and sentence.

## II. Discussion

### A. Ex Parte Communications

Williams argues that Judge Bruce's ex parte communications with the Office violated both his due process rights and the federal recusal statute, warranting a new trial. Although none of the ex parte communications concerned Williams's case, some of them were either about or involved Peirson, the Office's Assistant United States Attorney who prosecuted Williams's case, and Klayer, the Office's paralegal assisting with his trial. Because Judge Bruce's ex parte communications were disclosed after Williams's trial, we review his

claims de novo. *See United States v. Atwood*, 941 F.3d 883, 885 (7th Cir. 2019).

**1. Due Process Clause**

The Due Process Clause guarantees litigants an impartial judge and a fair trial. *See Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997). Courts presume that judges are honest, upright individuals who rise above biasing influences. *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005). But that presumption is rebuttable. *Id.* at 960. Whether a judge should be recused is an objective inquiry; courts do not ask "whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009).

This does not require proof of actual bias, "though actual bias, if disclosed, no doubt would be grounds for appropriate relief." *Id.* at 883. "[B]ad appearances alone do not require disqualification." *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc); *see also Suh v. Pierce*, 630 F.3d 685, 691–92 (7th Cir. 2011) (rejecting the argument that recusal is required "in the absence of *any* possibility of actual bias—that is, based *solely* on how the situation might have 'appeared' to an outside observer."). To prove a disqualifying bias, there must be evidence of "either actual bias, or a possible temptation so severe that we might presume an actual, substantial incentive to be biased." *Del Vecchio*, 31 F.3d at 1380. For the latter, courts must determine whether "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017) (per curiam) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

Courts have identified a limited set of circumstances that meet this standard. First, actual bias is disqualifying. *See, e.g., Franklin*, 398 F.3d at 961–62 (finding actual bias where there was evidence that the judge determined that defendant was guilty before trial). Second, "there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016). Third, a judge is disqualified when the judge has a financial incentive in the case's outcome. *See, e.g., Rippo*, 137 S. Ct. at 906; *Caperton*, 556 U.S at 877–78; *Bracy*, 520 U.S. at 906, 909; *Bracy v. Schomig*, 286 F.3d 406, 413, 419 (7th Cir. 2002) (en banc). Lastly, a judge should recuse himself when the judge becomes "personally embroiled" with a litigant. *Mayberry v. Pennsylvania*, 400 U.S. 455, 465–66 (1971); *see also Del Vecchio*, 31 F.3d at 1373–75.

This case does not fit into these buckets. Williams has not provided any evidence of actual bias. To the contrary, the Special Committee found "no evidence and received no allegation that Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party." It is undisputed that none of the ex parte communications concerned Williams's case. Nor is there any evidence that Judge Bruce had a pecuniary interest in the outcome, previously worked on the case as a prosecutor, or became "personally embroiled" with the parties.

Williams's only evidence is an exchange between Judge Bruce and Peirson that occurred before voir dire, and on the record in open court regarding pre-trial evidentiary issues.

MS. PEIRSON: So I just wanted to let the Court know … I'm not trying to be sneaky. It's just not something

that I thought about until I looked—examined his statement more closely. He does make that statement, and that's not an issue for purposes of—

THE COURT: I have never found you ever to be sneaky. If anything, you are overly cautious.

MS. PEIRSON: Thank you, Your Honor.

THE COURT: "Sneaky" is definitively not a word I would use with you.

Williams contends this is proof of Judge Bruce's personal bias in favor of the government because he "personally vouch[ed] for [the prosecutor's] integrity." This argument fails. There is nothing improper about this exchange, which occurred before both parties, on the record, in open court, and outside the presence of the jury.

Williams also argues that there is a due process violation here because, although the ex parte communications were about other cases, they expose a preexisting relationship between Judge Bruce and specific members of the Office who were prosecuting Williams. He focuses on Judge Bruce's friendship with Klayer. But a preexisting relationship alone does not create a due process violation. *Del Vecchio*, 31 F.3d at 1372. Judges are humans and will bring their experiences to the bench. "[N]ot all temptations are created equal. We expect—even demand—that judges rise above these potential biasing influences, and in most cases we presume judges do." *Id.* Williams has presented no evidence to rebut this presumption. Although Klayer was in the courtroom during Williams's trial, there is no evidence that she had any influence in his case or that Judge Bruce and Klayer had any ex parte communications about Williams's case.

The cases Williams cites to the contrary are factually distinguishable. Most of them involve evidence of actual bias or a strong risk of actual bias. *See Rivera v. Superintendent Houtzdale SCI*, 738 F. App'x 59, 65–66 (3d Cir. 2018) (stating that evidence of judge's personal relationship with the uncle of the victim and potential interference with judicial case assignment create a strong risk of actual bias); *Barney v. Conway*, 730 F. Supp. 2d 264, 279–80 (W.D.N.Y. 2010) (finding that defendant presented "clear and uncontroverted documentary proof" of an actual bias that predetermined the case outcome); *Abdygapparova v. State*, 243 S.W.3d 191, 208–10 (Tex. App. 2007) (finding that the judge's written communications with the state regarding potential jurors, defendant's voir dire questions, and case presentation were strong evidence of bias and partiality); *In re Paternity of B.J.M.*, 925 N.W.2d 580, 588 (Wis. Ct. App. 2019) (finding that accepting a litigant's Facebook "friend" request after an evidentiary hearing but before entering a ruling created a great risk of actual bias), *review granted*, *Miller v. Carroll*, 933 N.W.2d 489 (Aug. 14, 2019). Another case involved ex parte communications regarding the case's substance. *See State v. Bard*, 181 A.3d 187, 200–01 (Me. 2018) (per curiam). And in *State v. Daigle*, 241 So. 3d 999 (La. 2018) (per curiam), the judge's actions violated the Code of Criminal Procedure and he erroneously denied having a social media relationship with the victim's widow, among other things, warranting recusal.

We conclude that Judge Bruce did not violate Williams's due process rights by presiding over his trial.

### 2. Federal Recusal Statute

Pursuant to 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself

in any proceeding in which his impartiality might reasonably be questioned." The statute is intended to avoid even an appearance of impartiality. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988). Statutes like this one "provide more protection than due process requires." *See Williams*, 136 S. Ct. at 1908 (quoting *Caperton*, 556 U.S. at 890); *United States v. Herrara-Valdez*, 826 F.3d 912, 919 n.1 (7th Cir. 2016).

Here, the government concedes that there has been a statutory violation; a reasonable person might question Judge Bruce's impartiality based on the post-judgment disclosure of the communications between him and the Office. The government argues, however, that the error was harmless. To determine whether an error is harmless, we look to the three factors the Supreme Court articulated in *Liljeberg*: (1) "the risk of injustice to the parties in a particular case," (2) "the risk that the denial of relief will produce injustice in other cases," and (3) "the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864; *see also Atwood*, 941 F.3d at 885; *Williamson v. Ind. Univ.*, 345 F.3d 459, 464 (7th Cir. 2003).

Not every violation of § 455(a) warrants a drastic remedy, like a new trial. *Liljeberg*, 486 U.S. at 862. We have been cautious about granting new trials based on the mere appearance of impropriety. *See In re Bergeron*, 636 F.3d 882, 883 (7th Cir. 2011) ("Actual bias would entitle the losing party to a new trial, but the mere appearance of bias would not …."); *see also United States v. Betts-Gaston*, 860 F.3d 525, 534–36 (7th Cir. 2017).

We recently decided one case regarding the implications of Judge Bruce's communications.* In *United States v. Atwood*, Judge Bruce sentenced Atwood after he pleaded guilty to three counts of federal drug crimes. On appeal, Atwood argued that Judge Bruce's § 455(a) violation entitled him to resentencing by a different judge. 941 F.3d at 885. Like here, none of the ex parte communications concerned Atwood's case. Applying the *Liljeberg* factors, we identified a real risk of unfairness to Atwood, a risk of injustice to other litigants in future cases, and risk of harm to the public's confidence in the impartiality of the judiciary if we affirmed Atwood's sentence. *Id.* at 885–86. Based on the facts in that case, we held that Judge Bruce's failure to recuse himself from sentencing Atwood did not constitute harmless error and remanded the case for resentencing. *Id.* at 886.

A key difference exists between this case and *Atwood*. In *Atwood*, the defendant entered a guilty plea, and Judge Bruce presided over his sentencing hearing. Here, Williams plead-

---

* There are pending post-judgment motions before the district court in several other cases regarding Judge Bruce's conduct. *See United States v. Gmoser*, No. 2:14-cr-20048-JES-4 (C.D. Ill. Oct. 2, 2018), ECF No. 309; *United States v. Nixon*, No. 2:15-cr-20057 (C.D. Ill. Oct. 25, 2018), ECF No. 173; *United States v. Lopez*, No. 2:16-cr-20004 (C.D. Ill. May 15, 2019), ECF No. 68; *United States v. Brown*, No. 2:14-cr-20007 (C.D. Ill. July 9, 2019), ECF No. 88; *United States v. Vasquez*, No. 2:17-cr-20003 (C.D. Ill. Jan. 17, 2019), ECF No. 52. There are also several pending motions under § 2255. *See Thomas v. United States*, No. 2:18-cv-02032 (C.D. Ill. Dec. 21, 2018), ECF No. 10; *Shannon v. United States*, No. 2:18-cv-02233 (C.D. Ill. Jan. 21, 2019), ECF Nos. 11–12; *Liggins v. United States*, No. 2:19-cv-02129 (C.D. Ill. May 16, 2019), ECF No. 1; *Parker v. United States*, No. 2:19-cv-2318 (C.D. Ill. Nov. 25, 2019), ECF No. 1; *Collins v. United States*, Nos. 2:19-cv-02339 (C.D. Ill. Dec. 20, 2019), ECF No. 1; *Farrington v. United States*, No. 2:19-cv-2314 (C.D. Ill. Jan. 3, 2020), ECF No. 9.

ed not guilty, and a jury found him guilty. Moreover, Judge Bruce did not preside over Williams's sentencing hearing. This distinction matters because judges generally have more discretion over sentencing than the outcome of a jury trial. As we noted in *Atwood*, "'[t]he open-endedness of the § 3553(a) factors leaves ample room for the court's discretion' … That discretion invites the risk that a judge's personal biases will influence or appear to influence the sentence he imposes." *Id.* at 885 (quoting *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015)). After applying the *Liljeberg* factors to the particular facts in this case, we conclude that the error here was harmless and does not warrant a new trial.

The first *Liljeberg* factor requires us to consider the risk of injustice to the parties in this particular case. We begin with the risk to Williams. The totality of the facts suggests that there is little risk of unfairness in upholding Williams's conviction. First and significantly, while some ex parte communications included Peirson or Klayer, it is undisputed that none of these communications concerned Williams's case. There is also no evidence that either Peirson or Klayer had any influence on the outcome here. Second, although Judge Bruce presided over Williams's trial, he was not the trier of fact making the ultimate determination of whether the government had proved Williams guilty beyond a reasonable doubt. A jury found Williams guilty, and Williams has not questioned the jury's impartiality. Third, Judge Bruce made minimal rulings before and during trial, none of which either party challenges on appeal. As to his pre-trial rulings, Judge Bruce granted routine scheduling and appearance motions for both parties. He denied the government's discovery motion as moot, but he granted the government's motion to bar an alibi defense because Williams failed to file a response

or object. Judge Bruce also denied as moot Williams's mo-
tion in limine to bar the government from introducing evi-
dence of prior convictions because the government repre-
sented that it did not intend to introduce such evidence in its
case in chief. The court specifically noted in its order that
"should circumstances change at trial, and the government
attempt to introduce such evidence during its case in chief,
Defendant may revive his motion." Williams has not argued
that any of these rulings prejudiced him. Indeed, the rulings
were not controversial or contested and generally pertained
to routine matters.

As to his trial rulings, Judge Bruce equally granted and
denied objections from both parties. Judge Bruce sustained
eight out of eighteen of defendant's objections and two out
of four of the government's objections. He also denied Wil-
liams's Rule 29(a) motion at the close of the government's
case and his renewed Rule 29 motion at the close of all evi-
dence. None of these rulings suggest that Judge Bruce's ap-
pearance of bias had any impact on the outcome of Wil-
liams's trial. Nor does Williams argue that any particular
ruling was prejudicial.

Williams attempts to rebut these facts by arguing that
under the government's view, "the harmlessness inquiry
would always require proof of actual bias, and would thus
render § 455(a)'s prohibition on the appearance of bias a nul-
lity." We disagree. The Supreme Court in *Liljeberg* cautioned
that "[a]lthough § 455 defines the circumstances that man-
date disqualification of federal judges, it neither prescribes
nor prohibits any particular remedy for a violation of that
duty." *Liljeberg*, 486 U.S. at 862. Rather it is up to each court
to determine what remedy is appropriate on a case-by-case

basis. Williams has the burden of showing that at least some of the *Liljeberg* factors counsel in favor of a new trial. A mere statutory violation alone does not automatically entitle him to a new trial.

Also for the first factor, we must consider the risk of injustice to the government if a new trial is granted. We agree with the government that the costs of retrial pose a significant risk of injustice to it. The government would likely spend valuable time and money to retry this case thereby diverting resources from other cases. *See United States v. Cerceda*, 172 F.3d 806, 814 (11th Cir. 1999) (en banc) (per curiam). Williams's case is distinguishable from *Atwood* in that regard. Unlike Williams, Atwood pleaded guilty and requested a resentencing by a different judge. *Atwood*, 941 F.3d at 884. "[A] remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018) (citing *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1348–49 (2016)). This factor favors denying Williams's request for a new trial.

The second *Liljeberg* factor asks us to evaluate the risk that the denial of requested relief will produce injustice in future cases. Williams argues that enforcing § 455(a) here may warn judges and litigants to more carefully consider possible grounds for disqualification before trial in other cases. The government contends that the Special Committee's Report has minimized the risk of similar, future violations. The Special Committee and the Judicial Council undertook a thorough investigation and review of the complaints against Judge Bruce, including requesting and reviewing document productions from Judge Bruce and the

Office, conducting interviews, and holding a hearing at
which Judge Bruce testified. The Special Committee submit-
ted a detailed report to explain its finding and recommenda-
tions, which the Judicial Council adopted and made public.
The Judicial Council subsequently issued an order publicly
reprimanding Judge Bruce and ordering that he remain un-
assigned from any matters involving the Office until Sep-
tember 1, 2019. *In re Complaints Against Dist. Judge Colin S.
Bruce*, Nos. 07-18-90053, 07-18-90067 (7th Cir. Jud. Council
May 14, 2019). Moreover, Judge Bruce changed his practices
in response to the inquiry. He adopted a policy prohibiting
any email communications with counsel, prepared a stand-
ard response to any future ex parte communications initiat-
ed by litigants, and created a system that populates cham-
bers email and his work email into separate inboxes. These
changes should help reduce any future problems. In this
case, we believe that this factor leans towards denying Wil-
liams's requested relief.

The last *Liljeberg* factor focuses on the risk of undermin-
ing the public's confidence in the judicial process. This factor
is a close call. Here, the fact that Williams was convicted by a
jury of his peers is significant. Unlike a sentencing, where
"the most significant restriction on a judge's ample discre-
tion is the judge's own sense of equity and good judgment,"
*Atwood*, 941 F.3d at 886, a judge has less discretion over the
outcome of a jury trial. We can imagine a case where a judge
has substantial discretion and his rulings have a significant
impact on the outcome, thus undermining the public's con-
fidence in the judicial process. But this is not one of those
cases.

As discussed above, none of Judge Bruce's pre-trial and trial rulings suggest any actual bias. And the Special Committee did not find any evidence that "Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party" in any case. On the other hand, overturning a jury verdict based purely on the appearance of bias creates a risk that the public will lose confidence in the judicial process. *See, e.g., Cerceda*, 172 F.3d at 815–16; *see also Bergeron*, 636 F.3d at 883–84; *Marcavage v. Bd. of Trs. of Temple Univ.*, 232 F. App'x 79, 84 (3d Cir. 2007). And requiring witnesses to relive this serious crime by testifying at a retrial would pose unwarranted hardship on the witnesses when all evidence suggests the original trial was fair and impartial. This final factor slightly favors upholding Williams's conviction.

Because all three *Liljeberg* factors suggest that the statutory violation was harmless error, we deny Williams's request for a new trial and affirm his conviction.

**B. Sentencing**

Despite telling the district court that he had no objections to the PSR, Williams argues that the court improperly calculated his Guidelines range based on a career offender status and a firearm enhancement. The government concedes that Williams does not qualify as a career offender. It contends that the district court's sentence was not plain error because the judge made clear that she would impose the same sentence based on § 3553(a) factors even if he did not qualify as a career offender. The government also argues that the firearm enhancement was proper.

When a defendant forfeits an objection to his sentence in the district court, we review the sentence for plain error. *United States v. Lynn*, 851 F.3d 786, 794 (7th Cir. 2017). Under the plain error standard, a defendant must prove a "(1) an error or defect (2) that is clear and obvious (3) affecting the defendant's substantial rights (4) and seriously impugning the fairness, integrity, or public reputation of judicial proceedings." *United States v. Jenkins*, 772 F.3d 1092, 1097 (7th Cir. 2014). We have repeatedly stated that "a sentencing based on an incorrect Guidelines range constitutes plain error and warrants a remand for resentencing, unless we have reason to believe that the error in no way affected the district court's selection of a particular sentence." *Id.* (quoting *United States v. Love*, 706 F.3d 832, 841 (7th Cir. 2013)).

### 1. Career Offender Status

A defendant is a career offender if he "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a)(3). The PSR stated that Williams has two prior convictions that trigger the career offender provision: one for Illinois aggravated criminal sexual abuse and another for unlawful delivery of a controlled substance.

The government concedes that Williams's aggravated criminal sexual abuse conviction is not a crime of violence. We agree. Whether a prior conviction qualifies as a crime of violence is a legal question we review de novo. *See United States v. Edwards*, 836 F.3d 831, 834 (7th Cir. 2016).

Courts use a categorical approach to determine sentencing enhancements. *See, e.g., United States v. Woods*, 576 F.3d 400, 403–04 (7th Cir 2009). Under the categorical approach,

sentencing courts compare the elements that form the basis of defendant's state conviction with the federal Guidelines. If the state statute's elements are the same as, or narrower than, those of the generic offense, the crime qualifies. *See, e.g.*, *Descamps v. United States*, 570 U.S. 254, 257, 261 (2013); *United States v. Campbell*, 865 F.3d 853, 855–56 (7th Cir. 2017). When a state statute defines multiple crimes, i.e., is "divisible," courts apply a modified categorical approach and may consult a limited set of documents to determine which offense defendant was convicted of committing. *See Edwards*, 836 F.3d at 835.

The Guidelines define a crime of violence as any offense punishable by imprisonment for more than a year that (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another," or (2) is, as relevant here, "a forcible sex offense." U.S.S.G. § 4B1.2(a); *see United States v. McDonald*, 592 F.3d 808, 812 n.1 (7th Cir. 2010) (noting that the "use of physical force" means the intentional use of force).

Williams's prior conviction did not involve the use of force. He was convicted of aggravated criminal sexual abuse under 720 ILCS 5/11-1.60. The Illinois statute criminalizes a wide range of conduct and is divisible. *See* 720 ILCS 5/11-1.60; *see also United States v. Fifer*, 188 F. Supp. 3d 810, 834 (C.D. Ill. 2016). The PSR states that Williams, "who was 17 years of age or older, committed an act of sexual conduct with S.W., who was under 13 years of age when [Williams] committed the act, in that [Williams] placed his hand on the vagina of S.W. for the purpose of sexual arousal of [himself]." Relevant here, a person violates that portion of the statute if he is 17 years or older and "commits an act of sexu-

al conduct with a victim who is under 13 years of age." 720 ILCS 5/11-1.60(c)(1)(i). Sexual conduct means "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age … for the purpose of sexual gratification …." 720 ILCS 5/11-0.1. This statute does not require "the use, attempted use, or threatened use of physical force." *See, e.g.*, *People v. Calusinski*, 733 N.E.2d 420, 423–24 (Ill. App. Ct. 2000) (affirming conviction of kissing a child).

Nor is it a forcible sex offense. The Guidelines commentary defines forcible sex offense as including "offenses of sexual abuse of a minor and statutory rape" if the conduct is either an offense under 18 U.S.C. § 2241(c) or an offense under state law that would have been an offense under § 2241(c). U.S.S.G. § 4B1.2, cmt. n.1. The latter requires proof that the defendant engaged in a "sexual act," which includes "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2). The Illinois statute is broader than the federal statute for two reasons. First, the Illinois statute includes abuse for touching a person through clothing while the federal statute does not. And second, it also encompasses touching of "any part of the body" while the federal statute requires touching "of the genitalia of another person."

Because Williams's prior conviction for aggravated criminal sexual abuse is not a crime of violence, it is not a qualifying predicate offense. Williams thus does not qualify as a career offender. We do not need to decide whether his prior

drug conviction is a controlled substance offense under the career offender provision because one prior conviction is insufficient to trigger it. *See* U.S.S.G. § 4B1.1(a)(3).

Williams next argues that the district court committed plain error by basing his sentence in part on a career offender status. The district court calculated his Guidelines range of 210 to 240 months' imprisonment with the career offender enhancement. This satisfies the first two elements of the plain error standard; it was a clear error to do so. The parties dispute whether the district court's incorrect calculation affected Williams's substantial rights or seriously impugned on the fairness, integrity, or public reputation of the judicial proceeding. Williams argues that the third and fourth elements are satisfied because the error resulted in a higher advisory Guidelines range than the applicable one.

"When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez*, 136 S. Ct. at 1345; *see also United States v. Paz-Giron*, 833 F.3d 836, 840 (7th Cir. 2016). Such errors also usually affect the fairness, integrity, or public reputation of judicial proceedings. *Rosales-Mireles*, 138 S. Ct. at 1908.

Where the district court clearly would have imposed the same sentence regardless of the erroneous calculation under the Guidelines, however, a reasonable probability of prejudice does not exist. As the Supreme Court has explained:

> The record in a case may show, for example, that the district court thought the sentence it chose was ap-

propriate irrespective of the Guidelines range. Judges may find that some cases merit a detailed explanation of the reasons the selected sentence is appropriate. And that explanation could make it clear that the judge based the sentence he or she selected on factors independent of the Guidelines.

*Molina-Martinez*, 136 S. Ct. at 1346–47. In *United States v. Thomas*, 897 F.3d 807 (7th Cir. 2018), for example, we held that the district court made clear that the imposed sentence was based on § 3553(a) factors.

[The judge] considered Thomas's personal character-istics, noting that Thomas engaged in illegal activity "all his life and admits that. He has no other employ-ment history." The judge noted in particular the terri-ble nature of the crime, saying, "These young chil-dren, I'm sure, were terrified. They had to be … taken in the middle of the night by strangers, armed, threat-ening, to a place where they didn't have any idea where they were going or whether they would remain alive." He also noted the importance of protecting the public from Thomas's future crimes, stating that if he were released, "these young victims will still be alive. And will they have to be constantly looking over their shoulder if the defendant is released?"

*Id.* at 817–18; *see also United States v. Tyson*, 863 F.3d 597, 600 (7th Cir. 2017) (noting that the district court stated the calcu-lated range "was not serving as the basis for the sentence he imposed").

Here, the record is clear that the district court would have imposed the same 180-month sentence regardless of

whether Williams qualified as a career offender. After calculating the Guidelines, the district court started her sentencing analysis by considering each of the § 3553(a) factors.

The district court first addressed the seriousness of the offense. She determined that the crime was "as serious as it gets."

> [I]t's because this is everybody's worst nightmare: waking up, going about their everyday business, going into a store to get a phone, or maybe working … at the store, and then being terrorized by a group of individuals and being held at gunpoint, fearing that they would not go home to their loved ones that day. Ever. Pushed to the ground, physically manhandled, hogtied … with zip ties … and victimized, all for the theft of phones. The quick and easy buck.

She specifically noted that "the impact that this left on every single person who was in that store that day far exceeds anything that [Williams] and [the] other participants had to gain."

The district court also focused on Williams's role in the offense. She noted that Williams was a full participant in this premediated crime. Williams and at least four other individuals planned this crime in advance, "[a]nd everybody had a role, and [Williams's] role was to drive the getaway car. But [Williams] knew full well what the other participants would be doing inside that store …." While Williams was not as culpable as the person who held the gun, he was more culpable than the person who just loaned them the car. "[Williams is] somewhere in the middle."

Lastly, the district court addressed Williams's personal history and characteristics. She explained that "career offender" is designed to "capture the most serious offenders who have a track record of committing violent crimes." She then noted that the advisory Guidelines range may overstate Williams's recidivism risk because he has a shorter criminal history than others who qualify as career offenders. At the time of sentencing, he was only 29. The district court concluded, however, that Williams still represents a strong recidivism concern given his role in the offense and the nature of his prior criminal history, which includes convictions for retail theft, delivery of a controlled substance, domestic battery, and aggravated criminal sexual abuse. She further noted the escalation in the seriousness of his criminal conduct over time, and this crime is the "most serious." The district court also expressed concern for his recidivism risk because Williams had violated every term of court-imposed supervision, except the last one. "So not only were the sentences of probation and jail and Department of Corrections not adequate enough to deter [Williams] from committing this offense, but also previous court orders were not enough to ensure [Williams's] compliance because [he] … committed new law offenses."

The district court acknowledged that she had the discretion to sentence below the Guidelines range and "not just blanket-apply it in every case." Nonetheless, Williams "represent[s] a very strong recidivism concern. So I think it's somewhere in the middle. If the career offender is not applied, [Williams] would be [in the] 121 to 151 [sentencing range]. I think that's way too low. It's too low because it doesn't fully take into account the recidivism concern that [Williams] pose[s]."

After a thorough review of the § 3553(a) factors, the district court explained:

> The bottom line is: My duty is to protect the public from [Williams], and I do think that a significant sentence in this case is necessary to do that to, hopefully, finally specifically deter [Williams] when [he] get[s] out from committing future crimes. [He will] age out, essentially, hopefully; and hopefully … tire out. It's not worth the risk. There's too much at stake. And I also think that the sentence that I'm imposing is— reflects the seriousness of the offense and [his] role in the offense and avoids unwarranted … sentencing disparities.

The district court then concluded by expressly stating that although "[c]areer offender applies in this case legally; but even if it didn't, this is still the sentence that I would impose, based on all the 3553(a) factors." She imposed a 180-month sentence, which is between the advisory career offender Guidelines range of 210 to 240 months and the advisory non-career offender Guidelines range of 121 to 151 months.

We find no plain error here. It is clear from her thorough assessment that the district court would have imposed the same sentence irrespective of the career offender provision. *See Thomas*, 897 F.3d at 817 (stating that there is no plain error where "the sentencing judge makes clear that the defendant's sentence simply does not depend on the resolution of a guideline issue"). The district court's detailed analysis of the § 3553(a) factors supports this statement and rebuts any suggestion that it was a conclusory comment. As a result, we conclude that the district court's error neither affected Williams's substantial rights nor seriously impugned the fair-

ness, integrity, or public reputation of the judicial proceeding.

**2. Firearm Enhancement**

Lastly, Williams argues that the district court improperly applied a six-level firearm enhancement at sentencing for two reasons. First, he argues that a BB gun, rather than a real firearm, was used in the crime. Second, he contends that the district court did not make its finding by a preponderance of the evidence. The government disagrees with both arguments: there was sufficient evidence for the district court to find that a firearm was used during the robbery and to apply a firearm enhancement.

The Sentencing Guidelines permit a six-level sentencing enhancement if a firearm was used during a robbery. U.S.S.G. § 2B3.1(b)(2)(B). The commentary to the Sentencing Guidelines defines a firearm as

> (i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device. A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.

U.S.S.G. § 1B1.1, cmt. 1(H).

Although Williams himself did not use a firearm during the crime, "in the case of a jointly undertaken criminal activity … all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably

foreseeable in connection with that criminal activity" are of-fense conduct that is attributable to the defendant. *See* U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Ramirez*, 783 F.3d 687, 690 (7th Cir. 2015).

Here, the district court did not err in applying the firearm enhancement to Williams. Under Federal Rule of Criminal Procedure 32(i)(3)(A), a district court is entitled to "accept any undisputed portion of the presentence report as a find-ing of fact." Williams did not raise any objections to the presentence investigation report. The presentence investiga-tion report and trial testimony support the district court's finding that another participant in the crime, Thomas James, used a firearm during the crime. Three witnesses testified that a black gun was used during the robbery. First, Ryan, a Sprint store employee, "described the gun as a black colored handgun that was not a revolver. When the gun was pointed at Ryan, he could see there was a silver colored ring around the tip of the barrel." Ryan said that James waved the gun and said "Good thing you told me [where the cell phones were] or I would have had to start shooting." Second, Nata-sha, a store customer, testified that James was "holding a black handgun." Third, Kasey, another store customer, testi-fied that a man was holding "a little black gun or some-thing" pointed at his stomach.

The only evidence to the contrary is James's testimony at William's trial. James testified that he later "learned that it was a BB gun," but "[i]t looked like a real gun." But he also stated that he thought it was a real gun when he committed the crime. Nor did he independently determine that it was a BB gun rather than a firearm; instead, the guy who gave him the gun later "told [James] it was a BB gun." In his interview

with the probation officer, James contradicted his trial testimony when he "claimed the gun he held in the robbery was a real firearm, and believed it was a .40 or .45 caliber." Williams did not dispute this fact in the presentence investigation report. And it was not plain error for the district court to rely on undisputed facts in this report. *See, e.g., United States v. Guajardo-Martinez*, 635 F.3d 1056, 1060 (7th Cir. 2011); *United States v. Aviles-Solarzano*, 623 F.3d 470, 475 (7th Cir. 2010). It is defendant's burden to prove that an error "*actually* occurred, not merely that an error *might* have occurred." *United States v. Williams*, 931 F.3d 570, 573 (7th Cir. 2019). Williams has not met that burden.

James's use of a firearm was also reasonably foreseeable. The presentence investigation report states that law enforcement had information that a group of individuals were robbing cellular telephone stores in the same manner. More specifically, two men would enter the store with firearms, escort all personnel in the back, make explicit threats, physically restrain the victims, steal merchandise, and make a getaway in two vehicles. That group included Thomas James and Randy Williams. At sentencing, the district court found that Williams was a full participant in the crime and knew what the other participants were doing inside the store. We find no reason to second-guess that determination.

AFFIRMED