In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1108

SHAWN SHANNON,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:18-cv-02233-JES — **James E. Shadid**, *Judge.*

ARGUED APRIL 14, 2022 — DECIDED JULY 12, 2022

Before SYKES, *Chief Judge*, and HAMILTON and SCUDDER,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. In a jury trial before District
Judge Colin S. Bruce, petitioner Shawn Shannon was con-
victed of nineteen counts of sexually exploiting a child and
one count of distributing child pornography. Judge Bruce sen-
tenced Shannon to 720 months (60 years) in prison. Shannon
challenges those convictions under 28 U.S.C. § 2255, arguing
that his trial counsel was ineffective and that he did not

receive a fair trial before an unbiased judge. The § 2255 motion was assigned to District Judge James E. Shadid, who denied relief. Shannon has appealed that denial.

We agree with Judge Shadid that Shannon's ineffective-assistance claim fails. Given the extensive and powerful evidence against Shannon, even if we were to assume his trial counsel's performance was deficient, he has failed to show that he was prejudiced by any deficiency. On the judicial-bias claim, we also agree with Judge Shadid that ex parte communications between Judge Bruce and staff of the U.S. Attorney's office do not warrant a new trial on guilt or innocence. Based on those ex parte communications and comments by Judge Bruce at Shannon's sentencing that implicitly discouraged an appeal, however, we conclude as a matter of our supervisory authority that Shannon must be resentenced before a different judge.

I.  *Facts and Procedural History*

A.  *Trial Proceedings*

In June 2016, Shannon was indicted by a grand jury in the Central District of Illinois on nineteen counts of sexually exploiting a child in violation of 18 U.S.C. § 2251(a) and (e) and one count of distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1).

The charges arose from Shannon's relationship with J.W., a minor. In a jury trial before Judge Bruce, evidence showed that the two originally met when J.W. was around eight years old. They began spending more time together when J.W. was around twelve. Shannon was in his forties at the time. J.W.'s mother testified that Shannon was like "a family member" and that she had hoped he could provide a positive male role

model for her son. She characterized Shannon as a "confidant" for J.W. and said that J.W. described Shannon as his best friend. J.W. helped with lighting and sound for Shannon's gospel music group—known as the Shannons—and occasionally traveled with them for performances. Shannon frequently bought gifts for J.W., including a new cell phone.

The government presented evidence that Shannon and J.W. exchanged thousands of text messages in the early months of 2015, when J.W. was thirteen. J.W. testified that they used a code—the letter "P"—so that Shannon would know not to text when someone else had J.W.'s phone. In many of the messages, Shannon wrote in graphic detail about masturbation, watching pornography, and other sexual activity. Shannon also discussed wanting to engage in sexual activity with J.W., who testified that those comments made him feel "very awkward."

Text messages from late February 2015 showed that Shannon and J.W. made plans to meet in Decatur, Illinois, where J.W. lived. Shannon said that he would take pictures of J.W. "with good poses." J.W. testified that he and Shannon stayed at a Decatur hotel on the night of February 28. While they were there, Shannon used his iPhone to take several nude pictures of J.W. Shannon told J.W. how to pose for the pictures. And J.W. testified that they masturbated together and watched pornography on Shannon's computer.

The government introduced evidence to corroborate J.W.'s testimony and to refute any suggestion that someone had framed Shannon by using another Apple device to send the messages. A forensic examiner testified that text messages extracted from Shannon's phone showed Shannon preparing for the Decatur trip. Cell phone location data indicated that

the phone was accessing a cell tower near Shannon's residence in Muncie, Indiana at the time the messages were sent. The witness also used location data from February 28 to trace the phone's movement across central Illinois toward the hotel in Decatur.

On a point critical to the framing theory at the heart of Shannon's § 2255 motion, the forensic expert also testified that if another device had accessed the Apple ID associated with Shannon's iPhone, then a system log entry would have been created. The expert had found no evidence of any such log entries to indicate that another device had accessed that Apple ID.

Along with this forensic evidence, records from the Decatur hotel showed that Shannon had checked in on February 28, 2015 and checked out the next day. Those records also revealed that Shannon was driving a black GMC Sierra, which matched the results of the government's investigation. Finally, the records indicated that Shannon had stayed in Room 222. A detective took pictures of that room several weeks later, and its furnishings resembled those visible in the pictures of J.W.

On March 17, 2015, J.W.'s mother discovered the sexually explicit messages and pictures on J.W.'s phone. She told Dustin Bradshaw, J.W.'s cousin, what she had found. Bradshaw, who was a member of Shannon's music group, texted Shannon about what he had heard. J.W.'s mother testified that she received several text messages from Shannon later that day. One message said: "Hey, Dustin just told me. I am sorry about taking pictures for [J.W.]. He asked for his girlfriend. I'll be 100 percent honest. I did not think at all." Another message said: "I should have … never done it. He's like a brother

to me; so when he asked, I just did it without thinking." Cell phone location data showed that Shannon's phone was near his Muncie residence when these messages were sent. The government's forensic expert also testified that text messages, emails, and contacts were deleted from Shannon's phone around March 18.

The pictures from the Decatur trip served as the basis for the child exploitation charges, while two other sexually explicit pictures of J.W. that Shannon sent him on March 14 were the subject of the charge for distributing child pornography. At trial, the government also twice offered evidence of prior acts under Federal Rule of Evidence 404(b). On both occasions, Judge Bruce gave a limiting instruction before the evidence was admitted. He admonished the jury that these acts had not been charged in the indictment and that the evidence could be used only "to help you decide whether the defendant had the intent or motive to sexually exploit a minor or to prove his identity."[1]

First, J.W. testified about an earlier occasion on which Shannon had taken sexually explicit pictures of him. In the fall of 2014, J.W. and Bradshaw traveled to Muncie for a music festival and stayed at Shannon's home overnight. After Bradshaw fell asleep, J.W. testified, Shannon and J.W. watched pornography and masturbated together. J.W. also said that Shannon took sexually explicit pictures of him. The pictures

---

[1] The instruction that Judge Bruce gave was consistent with Rule 404(b), which allows such "other acts" evidence for certain limited purposes. At trial, the judge did not refer to Rule 414, which allows broader use of evidence of other acts of child molestation in a criminal case alleging child molestation. Consistent with the instruction Judge Bruce gave, we assume that the evidence was admitted under Rule 404(b) in both instances.

showed J.W. with his shirt lifted and his penis exposed. An-
other forensic expert testified that these pictures had been re-
covered from J.W.'s phone, where they were stored in an ap-
plication called Video Safe 2. J.W. explained that the applica-
tion "hid photos" and that Shannon had paid for and installed
it on J.W.'s phone.

Second, the government presented evidence—subject to
the same limiting instruction—about Shannon's relationship
with A.W., another minor. A.W. testified that he was sixteen
years old when he met Shannon on a dating website in 2009.
Although A.W.'s dating profile listed his age as eighteen,
A.W. said he eventually admitted to Shannon that he was
younger. A.W. testified that Shannon asked him for sexually
explicit pictures on multiple occasions and told him how to
pose. A.W. sent Shannon such pictures, and Shannon also sent
A.W. sexually explicit pictures that he had taken of himself.
In addition, A.W. testified that Shannon invited him to his
home and performed oral sex on him.

The defense did not call any witnesses. After less than
thirty minutes of deliberation, the jury found Shannon guilty
of all nineteen counts of sexually exploiting a child and the
single count of distributing child pornography.

B.  *Post-Trial Proceedings and Sentencing*

Two weeks after the verdict, Shannon moved for a new
trial. Judge Bruce denied the motion. In doing so, he criticized
the motion's "bare and unsupported contentions" and com-
mented that Shannon's counsel appeared to have spent "little
time" on it.

Shannon's case then moved to sentencing. Based on the
underlying   charges   and   several   enhancements,   the

presentence report calculated an offense level of forty-three, a criminal history category of I, and an advisory guideline sentence of life in prison. The statutory maximum, however, was thirty years for each child exploitation count and twenty years for the distribution of child pornography count. Judge Bruce—and both parties—understood the Guidelines to recommend a sentence of 7,080 months (590 years), "consisting of 360 months on each of Count One through Nineteen and 240 months on Count Twenty, all to run consecutively." *Shannon v. United States*, No. 18-cv-2233, 2020 WL 6947421, at *4 (C.D. Ill. Nov. 25, 2020). Whether the Guidelines actually recommended maximum, consecutive sentences on all counts for 590 years is not a question we need to resolve. Cf. U.S.S.G. § 5G1.2(d) (impose consecutive sentences "only to the extent necessary to produce a combined sentence equal to the total punishment").

Shannon's trial counsel withdrew, and a federal defender was appointed to represent Shannon at sentencing. Shannon objected to obstruction-of-justice enhancements that the probation office had recommended based on Shannon's having deleted evidence on his phone shortly after J.W.'s mother went to the police. Judge Bruce overruled the objection, concluding that Shannon was aware of the police investigation and "began to take steps … to destroy evidence." The judge also largely approved the government's restitution requests.

Next, Judge Bruce turned to the sentence itself. He emphasized that the evidence against Shannon was "overwhelming" and said that the suggestion of a conspiracy to frame him for the messages and pictures was "patently ridiculous." Judge Bruce then went through the 18 U.S.C. § 3553(a) factors. He said that he had considered, among other things, the "very

damaging" nature of the offense, the need to deter child exploitation, and the fact that Shannon was "completely unrepentant." At the same time, the judge described the 590-year guideline sentence as "way out of bounds" and "not even close to being a just sentence." Instead, he sentenced Shannon to 720 months in prison (60 years), to be followed by a life term of supervised release. While Judge Bruce noted that the sentence was a downward departure of almost 90 percent, he reiterated that he found 590 years "to be just ridiculously overkill."

At that point, just before explaining Shannon's appeal rights, Judge Bruce made several troubling comments that could easily be understood as adding up to a thinly veiled threat if Shannon were to appeal. Judge Bruce said he had "struggled with coming up with the appropriate sentence," which would ordinarily seem a benign point, but then suggested that he might impose a higher sentence if the case were to come back for resentencing. And in fact, Shannon did not appeal.

C. *Shannon's § 2255 Motion*

In September 2018, Shannon filed a timely motion for relief under 28 U.S.C. § 2255. He alleged that his trial counsel had been ineffective for several reasons. According to Shannon, his lawyer failed to call witnesses or offer evidence to show that someone other than Shannon had sent the messages and taken the pictures of J.W. He also alleged that his lawyer did not effectively challenge the government's forensic evidence. And Shannon argued that his lawyer failed to object adequately to the admission of A.W.'s testimony under Rule 404(b).

A few months later, Shannon filed an amended § 2255 motion. He added a new claim that he did not receive a fair trial before an impartial and unbiased judge. That claim was based on the public disclosure of ex parte communications between Judge Bruce and staff of the U.S. Attorney's Office in the Central District of Illinois. Those communications included an exchange between Judge Bruce and a paralegal in the office about scheduling Shannon's sentencing. The communications are described at length in a report of the Seventh Circuit Judicial Council and have been discussed in several appellate opinions. See *In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067 (7th Cir. Jud. Council May 14, 2019), http://www.ca7.uscourts.gov/judicial-conduct/judicial-conduct_2018/07_18-90053_and_07-18-90067.pdf; see also *United States v. Gmoser*, 30 F.4th 646 (7th Cir. 2022); *United States v. Orr*, 969 F.3d 732 (7th Cir. 2020); *United States v. Williams*, 949 F.3d 1056 (7th Cir. 2020); *United States v. Atwood*, 941 F.3d 883 (7th Cir. 2019).

Shannon alleged that these ex parte communications revealed disqualifying bias that amounted to a due process violation. The emails about his own case, he said, showed Judge Bruce's "eager anticipation of the sentencing" and raised "serious questions about Judge Bruce's bias in favor of the government." Shannon also pointed to several emails in other criminal cases, asserting that they revealed "a pattern of unethical *ex parte* discussions."

Shannon's § 2255 motion was assigned to Judge Shadid, who denied relief. First, he concluded, Shannon had failed to show that trial counsel provided constitutionally ineffective assistance. There was no need for an evidentiary hearing, the judge explained, because Shannon could not show that he had

been prejudiced given "the overwhelming and uncontra-
dicted evidence of his guilt." *Shannon*, 2020 WL 6947421, at
*13. On the due process claim, Judge Shadid found no evi-
dence of actual bias against Shannon on the part of Judge
Bruce. Judge Shadid also held that any appearance of bias
raised by the ex parte communications did not amount to an
actual constitutional violation.

Judge Shadid granted Shannon a certificate of appealabil-
ity on the issues "whether Shannon received ineffective assis-
tance of counsel and whether he is entitled to a new trial un-
der the due process clause due to Judge Bruce's ex parte com-
munications." *Shannon*, 2020 WL 6947421, at *20. Shannon has
appealed. We address in Part II his claim that he is entitled to
a new trial based on ineffective assistance of counsel. In Part
III, we turn to the issue of judicial bias.[2]

II.  *The Ineffective Assistance of Counsel Claim*

Shannon argues that his trial counsel (1) failed to intro-
duce evidence showing that Shannon was innocent, (2) made
improper comments that bolstered the government's case,
(3) did not adequately object to the admission of A.W.'s testi-
mony, and (4) was generally ineffective for a variety of other
reasons. In reviewing the denial of a § 2255 motion, "we

---

[2] The certificate of appealability expressly mentions only a new trial, but
we treat it as encompassing whether Shannon is entitled to resentencing
based on the ex parte communications. Judge Shadid did not issue a cer-
tificate of appealability on two other issues raised by Shannon: whether
Judge Bruce should have recused himself under the recusal statute, 28
U.S.C. § 455, and whether Shannon was entitled to a new trial on the the-
ory that staff of the U.S. Attorney's office violated the Illinois Rules of Pro-
fessional Conduct by engaging in ex parte communications with Judge
Bruce.

review the district court's legal conclusions de novo, its factual findings for clear error, and its decision to deny an evidentiary hearing for abuse of discretion." *Bridges v. United States*, 991 F.3d 793, 799 (7th Cir. 2021); see also *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (rejecting petitioner's argument that lack of evidentiary hearing altered standard of review). But cf. *United States v. Copeland*, 921 F.3d 1233, 1242 (10th Cir. 2019) ("[W]e conduct a de novo review of a denial of a § 2255 motion when the district court did not hold an evidentiary hearing.").

The Sixth Amendment guarantees a criminal defendant "the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel "is the right to the *effective* assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (emphasis added), quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). In evaluating an ineffective-assistance claim, the benchmark is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

*Strickland* adopted a now-familiar two-prong test: a defendant must show that counsel's performance was deficient and that the defendant suffered prejudice as a result. 466 U.S. at 687. The first prong requires a showing that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. To satisfy the second, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court making this determination "must consider the totality of the evidence before the judge or jury." *Id.* at 695. The court need not "address both components of

the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. In cases where "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed." *Id.*

We follow that course here. Even if we were to assume that trial counsel's performance was deficient in certain respects, we agree with Judge Shadid that Shannon cannot show prejudice in light of "the overwhelming and uncontradicted evidence of his guilt." *Shannon*, 2020 WL 6947421, at *13.

A.  *Failure to Introduce Evidence*

Shannon argues that evidence not presented at trial would have established his innocence. We disagree. Even accepting the truth of the evidence Shannon offers now, none of it— alone or taken together—raises a reasonable probability that the outcome of the trial would have been different.

1.  *Shannon's Theory of "Framing"*

Shannon focuses heavily on trial counsel's failure to introduce evidence to support the defense theory that Dustin Bradshaw posed as Shannon to send the messages and pictures to J.W. As noted, Bradshaw is J.W.'s cousin and was a member of Shannon's music group. According to Shannon, his trial counsel was aware that Bradshaw "had the motive and opportunity" to frame Shannon.

Shannon emphasizes two messages from Bradshaw—an email to Shannon's mother and a Facebook message to both of Shannon's parents—that he says trial counsel was aware of. In the February 2015 email, Bradshaw wrote:

> I don't know how you will take this but I talked
> to Shawn and he is on me to return his stage

> lights. I told him I am not returning them I need them and he don't. I want this to stop him asking for them back or he is going to be sorry.… I am sick of this and it better stop or I will see that he loses everything and I know how to do it. I think I am being nice about this because I could come when he isn't home and take what I need. I have keys to his house and all his passwords for his computers phone and things so don't underestimate me what I can do. You better talk to him or I will take matters in my own hands and it won't be a good thing for him or you guys.

The Facebook message was sent in March 2016, a few months before Shannon's trial. It said:

> Wilma and James, I know you don't care to hear from me. However when I contacted you guys last year and Shawn got upset with me he put my IPad in lost mode which locked me out of it completely. This is the IPad that I bought after my house was broken into. It took me a year to find the original proof of purchase. I again contacted apple and they can't do anything without the password to the Apple ID shawn@theshannons.com. I also asked the attorney about this issue and they wanted me to ask politely if you would give me the information for this iPad so I can open it up and get his id off of it. If not I will have to get a court order for Apple to do it. Thanks.

Shannon says his lawyer had been informed that Bradshaw had stolen Shannon's iPad. He asserts that the iPad "would

give Mr. Bradshaw access to all of [Shannon's] other Apple devices and the ability to pose as [Shannon] while iMessaging."

Closely related to that theory, Shannon says his lawyer should have cross-examined the government's forensic experts about the possibility that Bradshaw could have sent and deleted messages on Shannon's devices without his knowledge. To support that argument, Shannon submitted an affidavit from an Apple technician asserting that "Shannon was possibly unaware and uninvolved in the transmissions of sexually explicit iMessages and photographs." In addition, the technician said, "it is possible that someone with another device linked by his Apple ID could have actually sent this information" without Shannon's knowledge. Note the speculative nature of this affidavit with "possibly" and "possible."

Even if we assume that not presenting this evidence was substandard professional conduct, Shannon cannot show he was prejudiced by any such error. The jury would have had to weigh any speculative suggestion that someone else had sent the messages and taken the pictures against all the evidence indicating that Shannon was responsible. To begin with, J.W. testified at length about how Shannon had taken the pictures and had sent him sexually explicit messages. Also, "overwhelming" electronic evidence pointed to Shannon. *Shannon*, 2020 WL 6947421, at *9. That evidence included: cell phone location data that tied messages about the Decatur trip to a cell tower near Shannon's home; deleted messages recovered from Shannon's phone that described his intentions to take pictures of J.W. and engage in sexual conduct; evidence that messages and other data were deleted from Shannon's phone soon after J.W.'s mother received the apology

texts; and evidence that Shannon had deleted the Video Safe application from his phone shortly after the apology texts were sent. See *id.* at *10. As Judge Shadid put it: "The list could go on, but the forensic evidence at trial thoroughly addressed and foreclosed Shannon's defense that someone else took the photographs and someone else sent all the messages and photographs unbeknownst to Shannon in this case." *Id.*

The messages from Bradshaw to Shannon's parents do not undermine that conclusion. At trial, Bradshaw testified that he had access to only the music on Shannon's iPad, and he said that he did not use the iPad to send text messages. Nothing in the email or the Facebook message contradicts that testimony. In fact, the Facebook message indicates that Bradshaw did *not* have the password to Shannon's Apple ID account. While the tone of the messages might have tarnished Bradshaw's credibility with the jury, his testimony was far from essential given the voluminous forensic evidence presented by the government. The hostile tone does not make Shannon's far-fetched theory that Bradshaw framed him by exchanging *over 7,000 messages with J.W.*—without Shannon's knowledge—because of a dispute over music equipment any more plausible. That theory is further weakened by the government's evidence that Shannon sent J.W. sexually explicit messages as early as January 2015 because Bradshaw's email threatening to "take matters in my own hands" was not sent until February 2015.[3]

_____

[3] Shannon also cites a third message, sent on March 21, 2015, which apparently showed that Bradshaw was trying to change the name of an upcoming music event called "The Shannons Gospel Rally." Shannon says this evidence "would have shown Mr. Bradshaw's desire to eliminate The Shannons and take over their events." Given that J.W.'s mother had

Nor does the Apple technician's affidavit help Shannon. The affidavit says only that it is "possible" that someone sent the messages without Shannon's knowledge. Many things are "possible," but the *Strickland* prejudice prong demands a reasonable probability that the outcome of the trial would have been different. See *Harrington v. Richter*, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable."), citing *Strickland*, 466 U.S. at 693. This evidence falls well short. It does not address the forensic expert's testimony for the government that he found no evidence of remote log entries to indicate that another device had accessed the Apple ID associated with Shannon's iPhone. Without effective rebuttal, that testimony demolishes the "framing" theory.

The Apple technician's affidavit also does not explain the apology texts that Shannon sent to J.W.'s mother the day she discovered the pictures. Cell phone location data showed that Shannon's phone was in the vicinity of his Muncie residence when those messages were sent. At oral argument, Shannon's counsel did not dispute that Shannon had sent the messages. Instead, counsel asserted that the messages were "general apologies" that were not necessarily related to the sexually explicit pictures. That argument is not persuasive. The messages said: "I am sorry about taking pictures for [J.W.]" and "I should have … never done it."

All told, even if this theory that Bradshaw—or someone else—posed as Shannon to send the thousands of messages had been fully developed at trial, we do not see a reasonable

---

discovered the pictures and gone to the police just four days earlier, we fail to see how this evidence would have changed anything.

probability that the verdict would have been different. The jury heard detailed testimony from J.W. indicating that Shannon was the person responsible, and that account was corroborated by extensive forensic and other evidence.

2. *Other Witnesses and Evidence*

Shannon also argues that trial counsel was ineffective for failing to present other evidence or to call several witnesses who were available to testify. First, Shannon says a local pastor would have testified that an underage member of his church had shown him nude pictures of Bradshaw that Bradshaw had sent her.[4] The pastor also would have testified that the Bradshaws had accused him of inappropriate contact with a church member. Second, Shannon asserts that his father, James Shannon, would have testified that he was with Shannon and J.W. in the Decatur hotel room on the night of February 28 and that Shannon did not take any pictures of J.W. Third, Shannon says that his mother, Wilma Shannon, would have testified about the messages from Bradshaw and about J.W.'s behavior—which she characterized as "weird"—back in 2014. Finally, Shannon argues that trial counsel failed to introduce evidence showing that J.W. was engaged in an ongoing text conversation on the night in question.[5]

---

[4] We emphasize that these allegations have not been tested for credibility.

[5] In an affidavit submitted by the government in response to Shannon's § 2255 motion, Shannon's trial counsel said he had several reasons for not calling these witnesses. He asserted that their testimony "would either not have any relevance to the defense's theory of the case, [was] inadmissible under the rules of evidence, would have suborned perjury or would have opened a line of questioning by the prosecution that would have been detrimental to [Shannon]." Because the district court did not hold an

Shannon cannot show a reasonable probability that any of this evidence would have made a difference. To the extent that the pastor and Wilma Shannon would have lent support to the theory that Bradshaw framed Shannon, their testimony almost certainly would not have changed anything for the reasons already discussed: J.W.'s detailed testimony and the uncontradicted forensic evidence showing that Shannon was the person responsible. Nor would Wilma's testimony about J.W.'s behavior in 2014—which the jury might have seen as an effort to blame the victim—have any real relevance to whether Shannon sent the messages and took the pictures in early 2015.

As for James Shannon's testimony, his affidavit says that he, Shannon, and J.W. spent the night of February 28 at the Decatur hotel. The affidavit further explains that James was with Shannon and J.W. the entire night—except for a half-hour in which James and Shannon left to get food—and did not see Shannon take any pictures of J.W. Notably, however, James's affidavit does not shed light on anything that happened after "about 1:00 a.m." because that is when he went to sleep. That is right around the time at least one picture of J.W. was taken, so these assertions do not directly contradict the government's case. The affidavit also places Shannon himself in the hotel room on the night in question. The forensic evidence indicated that J.W. did not take the pictures himself because they were taken with the camera on the back of the phone—not the front—in intervals too short to have involved a timer. So even if James was also in the hotel room that night, asleep, someone still had to have taken the pictures of J.W.

---

evidentiary hearing on Shannon's § 2255 motion, neither Judge Shadid nor this court has been in a position to weigh those explanations.

None of Shannon's evidence offers any persuasive reason to think that person was someone other than Shannon.

The evidence about J.W.'s text conversation on the night of February 28 is similarly unhelpful. Shannon says trial counsel should have introduced evidence that J.W. exchanged almost 150 texts with someone between 9:19 p.m. and 1:23 a.m., a window that overlaps with the time period during which the pictures were taken. But this evidence does not refute J.W.'s testimony or any of the government's forensic evidence. In fact, J.W.'s cell phone was visible in some of the pictures taken at the Decatur hotel, suggesting that he could have been engaged in a text conversation at the time. We fail to see how this evidence would have affected the jury's verdict.

### B. *Trial Counsel's Comments*

Shannon points to comments his trial lawyer made about the forensic evidence as another indication that he was ineffective. At the beginning of his cross-examination of one of the government's forensic experts, trial counsel said: "I think after court today, I'm going to destroy all my mobile devices." Later, during closing argument, trial counsel said: "Now, we had all this expert testimony and everything. And I wasn't kidding. After hearing all that, I don't even want to talk on the phone anymore." Shannon says these remarks reinforced the credibility of the government's experts and implied that Shannon was guilty.

The argument overstates the weight of trial counsel's comments. Contrary to Shannon's assertions, the comments did not suggest that counsel thought his client was guilty. After the opening remark about destroying devices, counsel went on to cross-examine the government's forensic expert about

the possibility that someone else could have sent the messages. In his closing argument, likewise, counsel mentioned the expert testimony but then repeated his contention that "nobody knows—who was behind those text messages." Trial lawyers commonly engage in a variety of tactics, including the use of humor, to build rapport with juries. See Amy J. St. Eve & Gretchen Scavo, *What Juries* Really *Think: Practical Guidance for Trial Lawyers*, 103 Cornell L. Rev. Online 149, 163–64 (2018) (cautioning lawyers against excessive joking but recognizing that "displaying a sense of humor can go a long way with a jury"). While attempts at self-deprecating humor are not without risk—particularly given the subject matter of this trial—Shannon identifies no reason to think that counsel crossed the line or that these comments affected the outcome.

C.  *Failure to Object to A.W.'s Testimony*

Next, Shannon argues that trial counsel was ineffective for failing to object adequately to the admission of A.W.'s testimony. As discussed above, A.W. testified that Shannon had sent him sexually explicit messages and pictures in 2010, when A.W. was under the age of eighteen. A.W. also said that Shannon asked him for sexually explicit pictures and engaged in sexual acts with him.

After the government filed its notice of intent to introduce the evidence, Shannon's lawyer submitted a motion in opposition. The one-page motion said that counsel had been unable to determine the identity of A.W. and that the government's "lack of specificity makes it difficult if not impossible to craft an appropriate response to the motion." In later holding that the evidence was admissible, Judge Bruce noted that the ruling was made "without any arguments from Defendant. Although this court gave Defendant nearly four weeks to

respond to the government's request to introduce other acts evidence, Defendant failed to file a meaningful response." The judge also described the defense's motion as "entirely lacking in substance."

Again, even if we assume counsel's performance was deficient on this point, Shannon was not prejudiced. Judge Shadid framed the issue as whether "exclusion of the testimony was a reasonable probability." *Shannon*, 2020 WL 6947421, at *12. That is also how both parties approach the issue on appeal. And if exclusion was not a reasonable probability, that is a sufficient basis for rejecting the claim.

In our view, however, even if exclusion had been a reasonable probability, the more central question is whether the exclusion of A.W.'s testimony would have had a reasonable probability of changing the verdict. See *Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."). In other words, what matters is the outcome of the trial, not the outcome of a hypothetical motion in limine. See, e.g., *Milton v. Boughton*, 902 F.3d 721, 724 (7th Cir. 2018) (affirming finding of no prejudice where counsel did not move to exclude uncounseled police lineup but "the evidence against [the defendant] was so compelling that the probability of an acquittal, if the lineup were suppressed, was negligible"); *Hinesley v. Knight*, 837 F.3d 721, 735 (7th Cir. 2016) (affirming finding of no prejudice where counsel did not object to "vouching statements" witnesses made in support of victim's credibility but statements "were highly unlikely to have influenced the judge's assessment of guilt"); *Cooper v. United States*, 378 F.3d 638, 642 (7th Cir. 2004) (finding no prejudice

where counsel did not object to use of anonymous tip but "there was sufficient evidence apart from the tip to support the reliability of the jury's verdict").

Even if A.W.'s testimony had been excluded, the jury still would have had J.W.'s testimony that Shannon was responsible for the messages and pictures, corroborated by the government's forensic evidence. As Judge Shadid acknowledged, A.W.'s testimony did have "the potential to prejudice the jury against Shannon." *Shannon*, 2020 WL 6947421, at *12. Considering all the other evidence against Shannon, however, we find it highly unlikely that removing A.W.'s testimony from the equation—assuming that had been a reasonable probability—would have given the jury reasonable doubt about Shannon's guilt. In a hypothetical second trial where A.W.'s testimony would be excluded, we see no reason to think the jury would return a different verdict.

D. *General Ineffectiveness Arguments*

Finally, Shannon argues broadly that counsel was ineffective because he did not show Shannon relevant discovery, tried to convince Shannon to plead guilty instead of discussing the case with him, filed only a cursory motion for a new trial, and failed to meet with Shannon before the initial sentencing hearing. Even accepting these allegations as true, Shannon does not explain—nor do we see—how the result of his case would have been different but for the alleged errors. The jury considered extensive firsthand testimony and forensic evidence before returning guilty verdicts in less than thirty minutes. Taking all the new evidence and alleged errors together, Shannon still cannot show a "reasonable probability … sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. His ineffective-assistance claim

fails. We also agree with Judge Shadid that an evidentiary hearing was unnecessary. Even if all of Shannon's allegations were true and counsel's performance was deficient, he cannot show that he was prejudiced for the reasons explained above.

III. *The Judicial-Bias Claim*

Shannon's second claim is that he was deprived of his right to a fair trial before an unbiased judge. That claim is based on Judge Bruce's ex parte communications with staff of the prosecuting U.S. Attorney's office. Again, we review the district court's legal conclusions de novo and its factual findings for clear error. *Bridges*, 991 F.3d at 799.

Due process requires "a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (internal citation and quotation marks omitted). Evidence of the presiding judge's actual bias "is sufficient to establish a due-process violation but it's not necessary." *Gacho v. Wills*, 986 F.3d 1067, 1068 (7th Cir. 2021). Due process is also denied "when, objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017), quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); see also *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009) (noting that "objective standards may also require recusal whether or not actual bias exists or can be proved").

We agree with Judge Shadid that Shannon is not entitled to a new trial on guilt or innocence based on his allegations that Judge Bruce was biased. But given the highly discretionary nature of sentencing, as well as the troubling comments

Judge Bruce made while explaining Shannon's right to appeal, we conclude as a matter of our supervisory authority—without deciding constitutional issues—that Shannon should be resentenced before another judge.

A. *Judge Bruce's Ex Parte Communications*

The details of Judge Bruce's ex parte communications have been recounted at length elsewhere. See *In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067 (7th Cir. Jud. Council May 14, 2019), http://www.ca7.uscourts.gov/judicial-conduct/judicial-conduct_2018/07_18-90053_and_07-18-90067.pdf. In short, Judge Bruce worked in the U.S. Attorney's Office in the Central District of Illinois for twenty-four years before his appointment to the bench in 2013. An investigation revealed around one hundred ex parte communications between Judge Bruce and staff of that office about cases pending before him. While many of those communications addressed logistical matters, some showed Judge Bruce congratulating prosecutors on favorable outcomes and offering advice about effective advocacy. The Judicial Council reprimanded Judge Bruce for breaching the Code of Conduct for United States Judges, but it found no evidence that the communications had affected any of his rulings. Judge Bruce had been removed from all cases involving the U.S. Attorney's office in August 2018—when the communications first became public—and was ordered to remain unassigned to such cases until September 2019.

One of Judge Bruce's ex parte emails specifically mentioned Shannon's case. In March 2017, a probation officer in the Central District of Illinois sent an email to three district judges, their law clerks, and two staff members of the U.S.

Attorney's office, notifying them that the probation office would be closed on September 11. Judge Bruce replied to all recipients of the message: "Shawn Shannon re-sentencing set for September 11. Nice." A paralegal in the U.S. Attorney's office then responded only to Judge Bruce: "Sounds like the probation officer assigned to this case needs to stay here and work!" Judge Bruce replied: "Yep. Don't think its moving……"

B. *New Trial?*

Judge Shadid correctly concluded that these ex parte communications do not require a new trial on guilt or innocence. We addressed a similar claim in *United States v. Williams*, 949 F.3d 1056 (7th Cir. 2020), where Judge Bruce had presided over the defendant's trial and conviction for obstruction of commerce by robbery. The defendant pointed to an exchange in open court where Judge Bruce commented that he had "never found" the prosecutor "to be sneaky." *Id.* at 1062. We concluded that there was nothing improper about the exchange. In addition, we rejected the defendant's argument that Judge Bruce's prior relationships with members of the prosecutorial team amounted to a due process violation. As a result, the defendant was not entitled to a new trial.

Shannon's case is distinct from *Williams* because none of Judge Bruce's ex parte communications were related to Williams' case. See 949 F.3d at 1062. As noted above, Judge Bruce did exchange emails with a paralegal in the U.S. Attorney's office about scheduling Shannon's sentencing.

That difference is not sufficient to warrant a new trial. Shannon argues that the email exchange "suggests Judge Bruce would not delay sentencing for any reason, and this

exuberance … shows that he was biased against [Shannon]."
We agree with Judge Shadid, however, that this interpretation
of the emails "is not the most logical one." *Shannon*, 2020 WL
6947421, at *15. A more plausible reading of the messages is
that Judge Bruce did not want to have to reschedule sentenc-
ing—for the second time—to accommodate the probation of-
fice, which, after all, works for the district court. Shannon of-
fers no other persuasive reason to think his new trial claim is
different from the one we rejected in *Williams*. He is not enti-
tled to a new trial.[6]

C. *Resentencing?*

Shannon's case does differ from *Williams*, however, in that
Judge Bruce presided over Shannon's sentencing. We have
not directly addressed whether Judge Bruce's participation in
a defendant's sentencing violated due process. See *United
States v. Gmoser*, 30 F.4th 646, 648 (7th Cir. 2022) (noting that
Judge Bruce had presided at defendant's trial but not at sen-
tencing); *United States v. Orr*, 969 F.3d 732, 736 (7th Cir. 2020)
(same); *Williams*, 949 F.3d at 1064 (same); see also *United States
v. Atwood*, 941 F.3d 883, 886 (7th Cir. 2019) (remanding for re-
sentencing because Judge Bruce's role in sentencing violated
recusal statute). We need not resolve that constitutional issue
here because Judge Bruce's troubling remarks at Shannon's

---

[6] Shannon also relies on *United States v. Orr*, 969 F.3d 732 (7th Cir. 2020),
but there we remanded for a new trial because Judge Bruce's involvement
violated the recusal statute—not due process. Shannon raised a challenge
based on the recusal statute in the district court. Judge Shadid denied that
claim, finding that it was not cognizable on collateral review. *Shannon*,
2020 WL 6947421, at *16. Shannon has conceded that he cannot pursue that
challenge on appeal because it was not encompassed by the certificate of
appealability that Judge Shadid issued.

sentencing, at least when combined with the ex parte communications, warrant a remand for resentencing under our supervisory authority. See *United States v. Jordan*, 991 F.3d 818, 821 (7th Cir. 2021) (resolving case under supervisory authority even though defendant had raised due process challenge); cf. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

Appellate courts have supervisory authority "to review proceedings of trial courts and to reverse judgments of such courts which the appellate court concludes were wrong." *Jordan*, 991 F.3d at 821, quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). That authority allows us to "require sound procedures that are not specifically commanded by the statutes or other relevant provisions." *Id.*; see also *Terry v. Spencer*, 888 F.3d 890, 895 (7th Cir. 2018) ("Our supervisory authority permits us to require district judges to observe 'procedures deemed desirable from the viewpoint of sound judicial practice although in [nowise] commanded by statute or by the Constitution.'"), quoting *Thomas v. Arn*, 474 U.S. 140, 146–47 (1985). Our supervisory authority "extends to sentencing." *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996); accord, e.g., *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004) ("[W]e exercise our supervisory powers over the district courts and announce a new procedural rule, requiring district courts, after pronouncing the defendant's sentence but before adjourning the sentencing hearing, to ask the parties whether they have any objections to the sentence just pronounced that have not previously been raised.").

Judges have broad discretion in sentencing proceedings. See, e.g., *United States v. Gries*, 877 F.3d 255, 261 (7th Cir. 2017) ("When it comes to weighing the relevant sentencing factors, the boundaries of the district judge's discretion are wide."); *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015) ("The open-endedness of the § 3553(a) factors leaves ample room for the court's discretion."). As we explained in *Williams*, that discretion distinguishes sentencing from a jury trial. See 949 F.3d at 1065 ("Unlike a sentencing, where 'the most significant restriction on a judge's ample discretion is the judge's own sense of equity and good judgment,' … a judge has less discretion over the outcome of a jury trial."), quoting *Atwood*, 941 F.3d at 886.

*Atwood* also involved a challenge to Judge Bruce's role in sentencing. He had sentenced the defendant to 210 months in prison for federal drug crimes. After the ex parte communications came to light, the defendant argued that Judge Bruce's participation violated the recusal statute, which provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The government conceded that the disclosure of Judge Bruce's ex parte communications "invited doubt about his impartiality in proceedings involving the Office." *Atwood*, 941 F.3d at 884. We concluded that Judge Bruce's failure to recuse was not harmless error, emphasizing the potential unfairness to the defendant and "the risk of harm to the public's confidence in the impartiality of the judiciary." *Id.* at 885–86. That was true even though Judge Bruce had not specifically mentioned Atwood's case in any of his ex parte emails. We remanded for resentencing by a different judge.

Shannon's challenge is based on his right to due process, not the recusal statute. But some of the concerns underlying our decision to remand in *Atwood* are still relevant. As we recognized, impartiality is particularly important in the sentencing context because of the "broad discretion" that the judge is afforded. 941 F.3d at 884. That sweeping discretion "invites the risk that a judge's personal biases will influence or appear to influence the sentence he imposes." *Id.* at 885.

The ex parte emails raise concerns about the possibility of such bias here. They "often showed Judge Bruce cheering on Office employees and addressing them by nicknames." 941 F.3d at 884. Other emails showed the judge congratulating former colleagues on favorable outcomes or offering reassurance after they made filing mistakes. See *Williams*, 949 F.3d at 1059. Evaluated against the backdrop of a jury trial and corresponding safeguards, these communications may not rise to the level of a due process violation. See *id.* at 1060–63. When combined with the considerable discretion a district judge has over sentencing, however, our concerns about the risks of bias are heightened.

Given these concerns, Judge Bruce's remarks at sentencing convince us that we need to exercise our supervisory authority to remand for resentencing before another judge. Just before explaining Shannon's appeal rights, Judge Bruce said that he had "struggled with coming up with the appropriate sentence." He continued:

> *If this case were to come back* for resentencing for some reason, I am not sure I would impose the same sentence again. *Part of me thought I should have imposed a higher sentence, and I might do that in the future*…. I struggle with what the adequate

sentence was, trying to balance the 3553(a) fac-
tors as well as the sentencing guidelines. I think
I have used my discretion appropriately and
come up with that sentence, which is a wide var-
iance from what the guidelines say. If I review
this again, I might come up with a different de-
cision, but that's what discretion is all about.

(Emphases added.) Judge Bruce then explained Shannon's
right to appeal, repeating that "I'm not sure [the sentence]
would be the same if I did it again, but I want to make sure
you know your appeal rights as well."

In the § 2255 proceedings, Judge Shadid said that these
"candid comments" were meant only "to provide Shannon
with further information and show that Judge Bruce had
erred on Shannon's side when reaching a lower sentence."
*Shannon*, 2020 WL 6947421, at *15. With respect, we do not be-
lieve that benign interpretation is persuasive here.

There is of course nothing wrong with a district judge's
providing a "thoughtful and thorough explanation of [her]
sentence." *United States v. Purham*, 795 F.3d 761, 765 (7th Cir.
2015). In fact, failure to explain a sentence adequately can be
a procedural error. *United States v. Ballard*, 12 F.4th 734, 740
(7th Cir. 2021).

Judge Bruce's comments, however, went beyond the kind
of candid and helpful explanations expected from district
courts. Particularly concerning is the judge's indication that
"[p]art of me thought I should have imposed a higher sen-
tence, *and I might do that in the future*." (Emphasis added.) It is
easy to see how Shannon could have interpreted this state-
ment as a thinly veiled warning: If you successfully appeal

this sentence, you run the risk of a harsher punishment. Hinting that a defendant will face an increased sentence if the case comes back after an appeal is not appropriate and has nothing to do with a district court's duty to explain the reasons for its sentence.[7]

The circumstances make this an appropriate case to exercise our supervisory authority. For one, we are providing a rule for district courts—not executive branch officials—to follow. See *Ming He*, 94 F.3d at 792–93 (noting that directing district courts not to further debriefing practice used by federal prosecutor was "within the traditional role of the Court" and was "not an encroachment on the conduct of executive branch officials"); *United States v. Herrera-Figueroa*, 918 F.2d 1430, 1434 (9th Cir. 1990) ("In prescribing a rule applicable only to the conduct of personnel within the judicial branch, we act in a sphere where the scope of our supervisory power is at its apex."); see also *United States v. Eastern Medical Billing, Inc.*, 230 F.3d 600, 607 (3d Cir. 2000) (observing that "our precedent has relied upon our supervisory power over the district courts to develop rules governing the content of jury instructions").

This problem is also likely to evade ordinary appellate review. For obvious reasons, a defendant given an implicit

---

[7] Our concerns about Judge Bruce's comments are not assuaged by his significant departure from what he and the parties understood to be the guideline range of 590 years. Judge Bruce himself said that a 590-year sentence would be "way out of bounds." As he explained: "590 years ago, Joan of Arc was around. The Aztec Empire and the Holy Roman Empire were both going strong.… The defendant needs to serve a substantial sentence, but anything even close to [590 years] is ridiculous." Judge Bruce's variance from that guideline advice does not insulate other elements of the sentencing proceeding from review.

warning that his sentence might be even higher after a second proceeding might well choose not to appeal. See *United States v. Peyton*, 353 F.3d 1080, 1093 (9th Cir. 2003) (Noonan, J., dissenting) (noting that British appellate judge's reputed practice of increasing sentences of appellants who lost on appeal "was an effective tactic for reducing appeals" but "was not a glory of British jurisprudence"), overruled on other grounds by *United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc). As a result, this issue will rarely come before us—except possibly on collateral review, as here. Cf. *Ming He*, 94 F.3d at 792 (noting particular importance of supervisory authority "when we are dealing with a procedure for which a uniform practice is called for"), citing *United States v. Coke*, 404 F.2d 836, 845 (2d Cir. 1968) (en banc) (Friendly, J.). See generally *In re United States*, 884 F.3d 830, 837 (9th Cir. 2018) (analyzing in supervisory mandamus context whether issue would "evade appellate review"). We therefore take this opportunity to make clear that any kind of hint or warning discouraging a defendant from appealing a sentence is not permissible and may well warrant resentencing.[8]

---

[8] In *United States v. Tsarnaev*, 142 S. Ct. 1024 (2022), the Supreme Court noted that some jurists have questioned the general existence of appellate courts' supervisory power, but the Court did not address that issue because the government had not raised it. *Id.* at 1035 n.1. Justice Barrett's concurring opinion expressed "skepticism that the courts of appeals possess such supervisory power in the first place." *Id.* at 1041. In dissent, Justice Breyer observed that "our precedents clearly recognize the existence of such a power." *Id.* at 1051. This court and others also have routinely recognized the existence of that power. See, e.g., *Jordan*, 991 F.3d at 821–23 (relying on supervisory authority to reverse district court's revocation of supervised release); *United States v. Moreno*, 809 F.3d 766, 780 (3d Cir. 2016) (invoking supervisory authority as alternative ground to hold that defendant may not be cross-examined during sentencing allocution); *United*

*       *       *

The district court's denial of Shannon's ineffective-assistance claim is AFFIRMED. The denial of a new trial is also AFFIRMED. Shannon's sentence is VACATED, and the case is REMANDED for resentencing before a different judge.

---

*States v. Gillenwater*, 717 F.3d 1070, 1085–86 (9th Cir. 2013) (exercising supervisory authority to bar defendant's competency hearing testimony from being used against him in subsequent trial); *United States v. Alcantara*, 396 F.3d 189, 203 (2d Cir. 2005) (using supervisory authority to vacate plea and sentencing proceedings held in robing room and remand for further proceedings to be held in public courtroom). In any event, this exercise of our supervisory authority does not involve a matter of pure procedure or threaten the rule-making process. We are saying that a sentencing court may not threaten a defendant, explicitly or implicitly, with a higher sentence in the event of a successful appeal.